PER CURIAM.
This case is before the Court on appeal from an order granting Ted Herring’s motion to vacate his sentence of death under Florida Rule of Criminal Procedure 3.851. Because the order concerns postconviction relief from a sentence of death, this Court has jurisdiction under article V, section 3(b)(1) of the Florida Constitution. For reasons outlined below, we reverse the circuit court’s order granting Herring’s motion to vacate his sentence of death.
I. FACTS AND PROCEDURAL HISTORY
In May 1981, Ted Herring shot and killed a convenience store clerk during a robbery in Daytona Beach, Florida. Herring was subsequently tried and convicted of armed robbery and first-degree murder. By a vote of eight to four, the jury recommended a sentence of death, which the trial judge followed. The trial court found four aggravating factors: Herring had previously been convicted of a violent felony; the murder was committed during the commission of a robbery; the murder was committed to prevent arrest; and the murder was committed in a cold, calculated and premeditated manner (CCP). The trial court also found two mitigating circumstances: Herring had a difficult childhood and suffered from learning disabilities; and Herring was nineteen years old at the time of the crime. See Herring v. State, 446 So.2d 1049, 1053 (Fla.1984). On appeal, this Court affirmed the convictions and the death sentence. Id. at 1058.[1]
This Court has also issued a number of opinions addressing various postconviction challenges to Herring’s conviction and death sentence. In each instance, we have upheld the death sentence and denied Herring postconviction relief.[2] Herring’s peti *893 tion for federal habeas relief was also denied by the United States District Court for the Middle District of Florida.[3] This is the first time that the question of Herring’s status as a person with mental retardation has been raised in any proceeding.
After the United States Supreme Court issued its decision in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), holding that the execution of a person with mental retardation is cruel and unusual punishment in violation of the Eighth Amendment, Herring filed a post-conviction motion in June 2003, in which he claimed that he is a person with mental retardation. The circuit court determined that an evidentiary hearing was necessary to make this determination. In November 2005, the circuit court conducted a two-day evidentiary hearing where three mental health experts were called to testify as to Herring’s intellectual functioning. The State called Dr. Greg Pritchard and Dr. Harry McClaren, both clinical psychologists in forensic private practice. The defense presented testimony from Dr. Wilfred van Gorp, a professor of clinical psychology at Columbia University and a neuropsychologist. While both State experts opined that Herring did not satisfy the diagnostic criteria for mental retardation, Dr. van Gorp testified that Herring did meet the criteria necessary to classify him as a person with mental retardation.
During the evidentiary hearing, the results of four intelligence quotient (IQ) tests that had been administered to Herring between the ages of eleven and forty-two were submitted as evidence of his general intellectual functioning ability. The scores of all four tests fell at or around the range of 70-75.[4] The circuit court concluded that this range was consistent with a diagnosis of mental retardation and issued an order vacating Herring’s death sentence. The court reasoned that Herring met all three prongs of the standard for mental retardation as articulated in Florida Rule of Criminal Procedure 3.203(b) and the American Psychiatric Association’s Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR). The three prongs include (1) significantly subaverage general intellectual functioning existing concurrently with (2) deficits in adaptive behaviors (3) that are manifested prior to age eighteen.
The State argues that the circuit court’s holding that Herring was mentally retarded is wrong as a matter of law because it *894 ignores this Court’s precedent requiring a defendant to demonstrate an IQ score of 70 or less in order to meet the criteria of “significantly subaverage general intellectual functioning.” The State notes that the circuit court found Herring’s IQ to be approximately 75, which means that as a matter of law Herring is not entitled to the relief granted. According to the State, the circuit court erroneously reasoned that Zack v. State, 911 So.2d 1190 (Fla.2005), does not impose a bright-line cut off score of 70 for a finding of mental retardation under Florida law and that the circuit court failed to even address recent decisions of this Court which are in direct conflict with the circuit court’s finding.
Herring asserts that the trial court’s determination that he is a person with mental retardation is a factual finding supported by competent, substantial evidence and that the State has no right to appeal this finding. Herring argues that the State is asking this Court to reweigh the evidence and reassess the credibility and opinions of the expert witnesses. Herring contends that his case is distinguishable from previous cases because the State agreed that the DSM-IV-TR, which does not impose a bright-line IQ score to make a determination that an individual is mentally retarded,[5] would govern. He further contends that it is unconstitutional to impose such an IQ cutoff because it permits the execution of mentally retarded persons in violation of Atkins.
The only issue presented for our review is whether the facts support the trial court’s legal conclusion that Herring has established the first prong of the mental retardation standard, i.e., significantly sub-average general intellectual functioning. Such legal conclusions are subject to de novo review by this Court. See Cherry v. State, 959 So.2d 702, 712 (Fla.2007).
II. ANALYSIS
In Atkins, the United States Supreme Court held it unconstitutional to execute a mentally retarded person. However, the Supreme Court relegated to the states the task of determining specific rules for who can be classified as mentally retarded. See Atkins, 536 U.S. at 817, 122 S.Ct. 2242 (“[W]e leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.”) (quoting Ford v. Wainwright, 477 U.S. 399, 405, 106 5.Ct. 2595, 91 L.Ed.2d 335 (1986)). Prior to the Supreme Court’s decision in Atkins, the Florida Legislature enacted section 921.137, Florida Statutes, in 2001. This statute exempts mentally retarded persons from the death penalty and provides a method for establishing whether a capital defendant is mentally retarded.[6]
*895 In accordance with section 921.137 and in response to Atkins, this Court adopted Florida Rule of Criminal Procedure 3.203 in 2004. This rule explicitly addresses mental retardation as a bar to the imposition of the death penalty and effectively parallels the language in section 921.137(1). See Amendments to Fla. Rules of Crim. Pro. & Fla. Rules of App. Pro., 875 So.2d 563 (Fla.2004). Florida Rule of Criminal Procedure 3.203(b) essentially mirrors the statutory definition and provides that the term “significantly sub-average general intellectual functioning” means “performance that is two or more standard deviations from the mean score on a standardized intelligence test authorized by the Department of Children and Family Services.”
In light of rule 3.203(b) and section 921.137, this Court has consistently held that in order for a defendant to be exempt from the death penalty based upon a claim of mental retardation, he must bear the burden of establishing all three criteria of the three-prong standard. See Jones v. State, 966 So.2d 319, 325 (Fla.2007); Burns v. State, 944 So.2d 234, 245 (Fla. 2006). Further, a defendant must prove each of the three elements by clear and convincing evidence. See § 921.137(4), Fla. Stat. (2010); Franqui v. State, 59 So.3d 82, 92 (Fla.2011) (“A defendant who raises mental retardation as a bar to imposition of a death sentence carries the burden to prove mental retardation by clear and convincing evidence.”); see also Nixon v. State, 2 So.3d 137, 145 (Fla.2009).
In reviewing determinations of mental retardation, this Court examines the record for whether competent, substantial evidence supports the determination of the trial court. Nixon, 2 So.3d at 141; Cherry, 959 So.2d at 712; Johnston v. State, 960 So.2d 757, 761 (Fla.2006). This Court “does not reweigh the evidence or second-guess the circuit court’s findings as to the credibility of witnesses.” Brown v. State, 959 So.2d 146, 149 (Fla.2007); see Trotter v. State, 932 So.2d 1045, 1049 (Fla. 2006). However, to the extent that the circuit court decision concerns any questions of law, the Court applies a de novo standard of review. Cherry, 959 So.2d at 712.
Despite various challenges to the application of a bright-line IQ cutoff as it relates to the first prong of the mental retardation standard, this Court has consistently and explicitly held that in order to prove exemption from execution under section 921.137 and rule 3.203, a defendant must establish an IQ of 70 or below. See Zack, 911 So.2d at 1201 (“Under Florida law, one of the criteria to determine if a person is mentally retarded is that he or she has an IQ of 70 or below.”) The numerical threshold of an IQ score of 70 or below is in line with the plain language of section 921.137(1) which states that significantly subaverage general intellectual functioning is two or more standard deviations from the mean score on a standardized intelligence test. One standard deviation on the Wechsler IQ test, which was administered to Herring in the instant case, is fifteen points. Two standard deviations from the mean of 100 is an IQ of 70. See Dufour v. State, 69 So.3d 235, 247 (Fla.2011) (stating that the plain meaning of section 921.137 and rule 3.203 provide that an IQ score of 70 or below is required to meet the first criterion of mental retardation); Phillips v. State, 984 So.2d 503, 510 (Fla.2008) (“We have consistently interpreted this definition to require a defendant seeking exemption from execution to establish he has an IQ of 70 or below.”); *896 Jones, 966 So.2d at 329 (interpreting the plain language of the statute to correlate with an IQ of 70 or below).
Herring is not the first defendant to ask this Court to reconsider the constitutionality of the bright-line cutoff of an IQ score of 70 in determining whether one meets the first prong of mental retardation. Recently, the defendant in Franqui alleged that the imposition of such a strict cutoff was in violation of the Eighth Amendment and failed to follow the Supreme Court’s decision in Atkins. Franqui argued that “Atkins approved a wider range of IQ results that can meet the test for mental retardation.” Franqui, 59 So.3d at 92. However, we rejected this argument, emphasizing that in Atkins “the Supreme Court did not mandate a specific IQ score or range for a finding of mental retardation in the capital sentencing process.” Id. We rejected a similar claim from the defendant in Nixon, explaining that “[i]n Atkins, the Supreme Court recognized that various sources and research differ on who should be classified as mentally retarded” and thus “left to the states the task of setting specific rules in their statutes.” Nixon, 2 So.3d at 142.
Moreover, we have specifically rejected Herring’s contention that the standard error of measurement must be factored into the IQ score. See Cherry, 959 So.2d at 713 (noting that the plain language of section 921.137(1) “does not use the word approximate” in defining significantly subaverage general intellectual functioning as correlating to two standard deviations from the mean, which is an IQ score of 70, and does not “reference the [standard error of measurement]”); Dufour, 69 So.3d at 247 (concluding that it was legal error for the circuit court to apply the standard error of measurement to find the range of the defendant’s IQ scores above the cut-off score of 70; rejecting defendant’s request to recede from Court’s previous decisions and factor in the standard error of measurement to benefit the defendant; and stating that “this Court has consistently interpreted the plain language of section 921.137(1) to require the defendant to establish that he or she has an IQ of 70 or below”).
In reaching its decision below, the circuit court cited a number of cases from this Court as supporting the proposition that “a growing body of legal cases [is] finding persons with IQ scores between 70 and 75 to be mentally retarded and thus exempt from execution.” The cases cited by the circuit court do not stand for this proposition. First, the decisions cited by the circuit court predated the Supreme Court’s decision in Atkins, which ruled that the mentally retarded are not subject to the death penalty. Second, in those cases where this Court vacated the death sentence of a defendant whose IQ score exceeded 70, the defendant’s low intellectual functioning was either factored into our proportionality review of the death sentence or was found to provide a reasonable basis for the jury’s recommendation of a life sentence. See, e.g., Cooper v. State, 739 So.2d 82, 85-86 (Fla.1999) (treating defendant’s IQ as a significant mitigating factor that weighed against imposition of the death penalty); Downs v. State, 574 So.2d 1095, 1099 (Fla.1991) (concluding that jury’s recommendation of life sentence was not unreasonable in light of borderline mental retardation and other significant mitigating evidence presented). In none of the cases cited by the circuit court was a defendant’s low intellectual functioning that exceeded the 70 IQ score treated as an absolute bar to execution as in Atkins.
 Finally, Herring argues that the DSM-IV-TR standard for mental retardation (which acknowledges a five-point stan *897 dard error of measurement and provides that “it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive functioning”[7]) should govern in this case because the State stipulated that this standard would apply in the proceedings below. The State replies that it never stipulated that an IQ score of 75 would be sufficient to establish mental retardation and that it repeatedly cited Zack for the principle that an IQ score of 70 or below is required under Florida law. The record shows that the parties stipulated that the DSM-IV-TR definition was controlling and was the functional equivalent of the Florida statutory and rule definitions. The record also shows that the State never agreed that an IQ score of 75 would be sufficient to establish mental retardation and did in fact cite Zack to the circuit court as requiring a score of 70 or below to establish the intellectual functioning prong of mental retardation under Florida law. However, even if the State had stipulated or agreed to a score of 75, the circuit court was obligated to follow this Court’s interpretation of section 921.187(1) and rule 8.203(b) in determining whether Herring was mentally retarded. The parties could not agree to create a different legal standard. Cf Polk County v. Sofka, 702 So.2d 1243, 1245 (Fla.1997) (explaining that parties cannot stipulate to subject matter jurisdiction where none exists). In the context of determining whether mental retardation is a bar to imposing the death penalty, “[t]he circuit court’s task is to apply the law as set forth in section 921.137, Florida Statutes, which provides for mental retardation proceedings in capital cases; and the circuit court must also follow this Court’s precedent.” Franqui, 59 So.3d at 92; accord Jones, 966 So.2d at 327. Here, the circuit court did not follow this Court’s clear precedent or the law set forth in section 921.137.
III. CONCLUSION
Based upon the reasons discussed above, we conclude that the circuit court erred as a matter of law in finding that Herring met the definition of mental retardation under Florida law. Accordingly, we vacate the circuit court’s order granting Herring’s postconviction motion.
It is so ordered.
PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.
CANADY, C. J., concurs in result.

. We subsequently struck down the application of the CCP aggravating circumstance. See Rogers v. State, 511 So.2d 526, 533 (Fla. 1987) (receding from holding in Herring that facts were sufficient to show heightened premeditation required for the application of CCP where there was no careful plan or prearranged design). However, we concluded that the elimination of the CCP factor did not "compromise the weighing process of either the judge or jury” and a new sentencing hearing was not required. Herring v. State, 580 So.2d 135, 138 (Fla.1991).

. See Herring v. State, 730 So.2d 1264 (Fla. 1998) (affirming denial of postconviction motion alleging that Herring received ineffective assistance of counsel due to a conflict of interest between defense counsel's status as a special deputy sheriff and his responsibilities as Herring's attorney); Teffeteller v. Dugger, 676 So.2d 369 (Fla.1996) (remanding several consolidated cases, including Herring's, for an evidentiary hearing on a conflict of interest claim); Herring v. State, 580 So.2d 135 (Fla. 1991) (remanding for an evidentiary hearing on a conflict of interest issue, but affirming *893 the death sentence despite striking down the CCP aggravator); Herring v. Dugger, 528 So.2d 1176 (Fla. 1988) (denying writ of habeas corpus on ineffective assistance of appellate counsel claim); Herring v. State, 501 So.2d 1279 (Fla.1987) (affirming summary denial of initial postconviction motion).

. See Herring v. Sec'y, Dep’t of Corr., 397 F.3d 1338 (11th Cir.2005) (affirming denial of Herring’s federal habeas petition).

. Herring scored a full scale score of 83 on the Wechsler Intelligence Scale for Children (WISC) that was administered in 1972. He received a full scale score of 81 on the WISC administered in 1974. A WISC-Revised administered in 1976 resulted in a score of 72. Herring’s most recent IQ test, the Wechsler Adult Intelligence Scale-Third Edition, was administered by Dr. McClaren in 2004 and yielded a full scale score of 74. Dr. van Gorp testified that the results of the two WISC tests conducted in 1972 and 1974 should be adjusted to account for the "Flynn effect,” which posits that the intelligence of the population increases over time. To obtain an accurate score in light of the Flynn effect, .311 points must be deducted from the measured score for each year between the test's administration and its date of publication in 1949. After accounting for the Flynn effect, Dr. van Gorp testified that Herring’s adjusted IQ scores were 76 and 74. We make no judgment as to the efficacy of adjusting for the Flynn effect because it is not relevant in this case. Even when Herring’s IQ scores are adjusted, the scores do not fall below 70.

. The American Psychiatric Association’s definition provides that "[t]he essential feature of Mental Retardation is significantly subaver-age general intellectual functioning ... that is accompanied by significant limitations in adaptive functioning in at least two ... skill areas ... [and] [t]he onset must occur before age 18 years.” Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000). The DSM-IV-TR further provides that a score of "about 70 or below” constitutes significantly subaverage intellectual functioning. Id.

. Section 921.137(1) provides the mental retardation means "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18.” Unlike the DSM-IV-TR, however, the statute does not specify an IQ range for determining the “significantly sub-average general intellectual functioning” prong. Instead, section 921.137(1) specifies that the term means "performance that is two or more standard deviations from the mean score on a standardized intelligence test spec *895 ified in the rules of the Agency for Persons with Disabilities.”

. Am. Psychiatric Ass’n, Diagnostic and Statistical Manual of Mental Disorders 41-42 (4th ed. 2000).