# Supreme Court of Florida

————————

No. SC12-749

————————

**SONNY BOY OATS, JR.,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[December 17, 2015]

PER CURIAM.

Sonny Boy Oats, Jr., appeals an order of the circuit court that denied his

motion filed pursuant to Florida Rule of Criminal Procedure 3.203,[1] in which he

claimed that he is intellectually disabled[2] and thus cannot be sentenced to death. In

---

1. Because the order concerns postconviction relief from a sentence of death, this Court has jurisdiction of the appeal under article V, section 3(b)(1), of the Florida Constitution.

2. The term originally used in these proceedings was "mentally retarded." This terminology was recently changed to "intellectually disabled," as recognized in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5), one of the basic texts used by psychiatrists and other experts. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 33 (5th ed. 2013). Thus, both the Florida Statutes and the Florida Rules of Criminal Procedure modified their relevant provisions to conform to the change in

light of developments in the law since <u>Hall v. Florida</u>, 134 S. Ct. 1986 (2014), and because the circuit court erred in its legal analysis regarding the onset of Oats's intellectual disability prior to the age of 18 and failed to consider all of the evidence presented, we reverse and remand for a full reevaluation of whether Oats is intellectually disabled.

Oats's intelligence quotient (IQ) has never been in genuine dispute. Based on numerous psychological tests, Oats's IQ is between 54 and 67, well within the range for an individual who has an intellectual disability. Up until the current litigation, expert after expert consistently recognized that Oats has an intellectual disability as defined by the Diagnostic and Statistical Manual of Mental Disorders (DSM)—a fact the State previously conceded in 1990 when litigating whether trial counsel was ineffective in failing to present mental mitigation, including Oats's intellectual disability. Recent records from prison also show that the Florida Department of Corrections is concerned that Oats may be intellectually disabled.

Despite this evidence, the circuit court denied finding Oats to be intellectually disabled, on the basis that Oats was unable to establish that his intellectual disability manifested before the age of 18—one of the three required

terminology. There is no difference in the meaning of these two terms. Accordingly, throughout this opinion, we use the term "intellectually disabled." <u>See also</u> <u>Hall v. Florida</u>, 134 S. Ct. 1986, 1990 (2014) (using the new terminology).

prongs in Florida's statutory test for determining an intellectual disability. See §

921.137, Fla. Stat. (2015).  In support, the circuit court relied on the lack of a full

childhood IQ test, even though an initial screening test performed by Oats's

elementary school showed that Oats's IQ was 70—a score that likewise would be

within the range of IQ scores for a person who has an intellectual disability—and

even though Oats presented significant evidence of childhood difficulties and

injuries consistent with an individual with an intellectual disability.

Our decision to reverse is based on three reasons.  First, in light of the

United States Supreme Court's decision in Hall, the circuit court's order should

have addressed all three prongs of the intellectual disability test, rather than

denying the claim solely because Oats allegedly did not present sufficient evidence

to establish that his intellectual disability manifested before the age of 18.  As the

United States Supreme Court has stated, "[i]t is not sound to view a single factor as

dispositive of a conjunctive and interrelated assessment."  Hall, 134 S. Ct. at 2001.

The United States Supreme Court's most recent decision regarding intellectual

disability reaffirms Hall and provides further authority that all three prongs

generally must be considered in tandem.  See Brumfield v. Cain, 135 S. Ct. 2269,

2278-82 (2015).

Second, the circuit court erroneously held that Oats failed to meet his burden

to establish his intellectual disability without even considering or weighing all of

the testimony that Oats presented, including the evidence submitted in prior postconviction proceedings from 1990 that both parties agreed was relevant and should be considered. This error is of particular concern given that Oats presented so much evidence of an intellectual disability during the 1990 proceedings that the State actually acknowledged that there was "[n]o doubt" he was "in the mildly mentally retarded area."[3]

Third, the circuit court erroneously conflated the term "manifested" with "diagnosed" and held that Oats failed to satisfy one of the necessary prongs of the statutory test for intellectual disability because Oats was not <u>diagnosed</u> as a child, even though the applicable Florida statute requires only that the intellectual disability "<u>manifested</u> during the period from conception to age 18." § 921.137(1), Fla. Stat. (emphasis added). Further, the circuit court relied exclusively on testimony from a State expert witness that was based on a misreading of this Court's precedent in <u>Cherry v. State</u>, 959 So. 2d 702 (Fla. 2007)—a decision that was subsequently disapproved by the Supreme Court in <u>Hall</u>.

We accordingly reverse the denial of Oats's rule 3.203 motion and remand to the circuit court to reconsider whether Oats is intellectually disabled. A remand

---

3. Even if not legally binding, we note that the State's experienced Assistant Attorney General also recognized during the current evidentiary hearing that manifestation of an intellectual disability before age 18 was so clear that it was "not really in play" in this case.

of this proceeding is particularly necessary in light of the dispositive opinion in Hall, in which the United States Supreme Court disapproved our opinion in Cherry and provided additional guidance pertaining to the necessary showing under Atkins v. Virginia, 536 U.S. 304 (2002), for establishing ineligibility for the death penalty as a result of an intellectual disability.

Based on further direction from the United States Supreme Court in Hall, reaffirmed in Brumfield, courts must be guided by established medical practice and psychiatric and professional studies that elaborate on the purpose and meaning of each of the three prongs for determining an intellectual disability. See Hall, 134 S. Ct. at 1993. In other words, in determining the definition of an intellectual disability, the informed assessments of medical experts cannot be disregarded. Id. at 2000. The experts review all three prongs together because determining intellectual disability is a "conjunctive and interrelated assessment." Id. at 2001.

**FACTS**

Sonny Boy Oats, Jr., was tried and convicted of the December 1979 robbery of a convenience store and the first-degree murder of the store clerk. This Court affirmed Oats's conviction on direct appeal but held that the trial court erroneously found three aggravating factors and remanded to the trial court for entry of a new sentencing order. Oats v. State, 446 So. 2d 90, 95-96 (Fla. 1984). On remand, the trial court reweighed the valid aggravators and reimposed the death penalty, a

sentence that this Court then affirmed. Oats v. State, 472 So. 2d 1143 (Fla. 1985). This Court later affirmed the denial of Oats's initial motion for postconviction relief and denied his petition for a writ of habeas corpus. Oats v. Dugger, 638 So. 2d 20 (Fla. 1994).

During the 1990 postconviction proceedings, Oats asserted that his trial counsel rendered ineffective assistance by failing to present statutory and nonstatutory mitigation evidence at the penalty phase based on an inadequate investigation of the available mitigation, including evidence pertaining to Oats's intellectual disability. In addition, Oats alleged that he was resentenced when he was incompetent. Numerous experts presented testimony regarding Oats's intellectual disability.

Dr. Robert Phillips testified that Oats "is a man of significantly substandard intellectual capacity as a result of a degree of mental retardation that is well documented in evaluations that have been performed by examiners of the State of Florida and are certainly consistent with the findings of my examination and a subsequent review of records." He further discussed Oats's "longstanding history of maladaptive behavior to societal expectations which is not inconsistent with individuals that we find to be mentally retarded." Dr. Phillips concluded that Oats "lacks the intellectual capacity to truly formulate with any degree of specificity well-conceived and executed plans. He rather tends to act far more on impulse

driven both by his emotion, sometimes overridden by the illicit substances which he may have on board but, by in large [sic], it's a moment-to-moment kind of decision-making process."

Dr. Joyce Carbonell testified that Oats "scores in the range that's referred to in general as mental deficiency. He is in the mildly mentally retarded range of functioning. His scores place him in the lowest one percent of the population in terms of his abilities, his intelligence compared to the rest of the population." She then opined that Oats's full-scale IQ score was 61, his performance score was 62, and his verbal score was 64. Further, Dr. Carbonell detailed how, based on reports from Oats's family and his school record, his social and medical history was likewise consistent with possessing an intellectual disability. Oats failed to timely reach numerous developmental milestones, including learning how to walk and talk on time; poor performance in school, with decreasing performance as he aged; and poor performance on an IQ screening test that was given during elementary school. Moreover, he had "serious deficits in adaptive functioning," was able to communicate at only a very low level, and could read at only a third-grade level. In addition, Oats was never able to maintain steady employment and always stayed with family that could take care of him.

Dr. Frank Carrera, who had testified during the penalty phase, previously evaluated Oats in 1980 to determine Oats's sanity and competency for the original

trial. While Dr. Carrera believed that Oats was competent, trial counsel never requested Dr. Carrera to evaluate whether Oats had an intellectual disability or whether any statutory mitigation applied. Dr. Carrera thereafter reviewed Dr. Carbonell's testing results and did not see any errors as to her findings that Oats had an intellectual disability. Moreover, he opined that Oats's IQ testing, which reflected an IQ of 61, was consistent with what he observed.

The State then called Dr. Charles Mutter, who had been retained by the State in the original trial proceedings to render an opinion as to several issues: (1) whether Oats was competent to stand trial in February 1981; (2) whether Oats's waiver of his Miranda[4] rights in 1979 was knowing and intelligent; and (3) whether Dr. Carrera's 1980 competency evaluation was sufficient. Dr. Mutter submitted a joint report with Dr. Leonard Haber and concluded that Oats was competent. Dr. Mutter noted that Oats had certain intellectual limits and impairments, but nothing that would affect his competency. While Dr. Mutter was not asked to perform testing as to whether Oats was intellectually disabled, Dr. Mutter later reviewed his prior test results and his contact with Oats and opined at the 1990 evidentiary hearing that Oats was "borderline to very mild retarded." He further discussed that

_____

4. Miranda v. Arizona, 384 U.S. 436 (1966).

Oats had deficits in adaptive functioning and was unable to learn from past experiences in certain circumstances.

Dr. Haber, who filed the joint report with Dr. Mutter, disagreed that Oats should be considered to have an intellectual disability. Although Dr. Haber never performed any IQ testing to establish Oats's intelligence, based on his in-person interview with Oats, Dr. Haber did not believe that Oats's intelligence testing score was accurate and estimated that a more accurate IQ score was between 70 and 90. Dr. Haber was then asked whether, based on the three prongs set forth in the relevant DSM, Oats would qualify as having an intellectual disability, to which Dr. Haber testified, "It is fair to say that based on the scores as reported, and the school record as reported, that Mr. Oats would seem to fit the category." He further agreed that if the IQ test results were accepted as accurate, Oats should be diagnosed with an intellectual disability under the relevant DSM criteria. Dr. Haber stressed that his focus was more on whether Oats understood the court proceedings.

In addition to the expert testimony, defense counsel also presented lay witnesses, Freddie Oats and Idella Russ, who grew up with Oats while he was being raised by his aunt and uncle, who were his foster parents. They testified as to Oats's intellectual abilities as a child, observing that Oats was slow in learning new information and that they had to help Oats tremendously. Freddie, Oats's

younger brother, testified that Oats had been a grade ahead of Freddie until Oats was retained in the second grade. Even after he was held back, however, Oats was not able to comprehend the same things as the other children in the class, so the teachers pulled him to the side and tried to work with him individually. Throughout their schooling, Freddie was in about half of Oats's classes, and he helped Oats with his work. Oats rarely passed tests on his own, so Freddie let Oats copy his answers. If Freddie was not in his class, Oats would find another student to copy from and cheat enough to "get by." At home, Oats had difficulty following instructions and would then get punished because he did not follow the directions correctly.

Idella Russ was raised in the same household as Oats and provided similar testimony, recalling that Oats was slow in learning something new. Even when Oats tried to memorize Bible verses and would choose the shortest verse possible, such as "Jesus wept," his siblings had to remind him of the verse because he kept forgetting it. When Oats was called upon in class, he seemed as though he had no idea what the teacher was asking. Oats liked going to school to get away from his foster mother's beatings, but his performance in school was very poor. Oats progressed through school by copying other people's work and test answers. Oats needed a person to sit down with him and explain how to do something before he

understood. He eventually dropped out of school in the tenth grade and did not return.

Further, while in the care of his foster parents, Oats was beaten severely, including being hit on the head with an extension cord and a hoe handle, resulting in scars to his head. Once, in a fall from a tree house, a corner of plywood hit Oats in the head, causing profuse bleeding. Oats was awake but so drowsy from the injury that he was unable to get up or move, and after his fall, he suffered terrible headaches. Following an escape from his aunt's house at age sixteen, he returned home to his biological parents, but fell through a porch, leading to another significant head injury. Although Oats has numerous scars on his head from these injuries, he was not taken to a doctor for many of them. Testimony established that these childhood injuries could have caused an intellectual disability.

During the 1990 postconviction proceedings, based on all of this evidence, the State conceded that Oats without a doubt had an intellectual disability under the applicable DSM, specifically stating, "Under the DSM-III criteria, the defendant falls in the mildly mentally retarded area. No doubt about that." However, according to the State, this did not entitle Oats to relief on his ineffective assistance of counsel claim because the jury already heard evidence that Oats had low intelligence, and it would not have recommended a life sentence even if the additional evidence had been presented. The postconviction court denied relief on

the claim that defense counsel was ineffective, finding that there was not a reasonable possibility that either the jury's recommendation or the ultimate sentence would have been different, even if trial counsel had presented all of the information. These proceedings occurred prior to the United States Supreme Court's decision in Atkins.

In Atkins, 536 U.S. at 321, the Supreme Court held that the Eighth Amendment prohibits the execution of an individual with an intellectual disability. Relying on Atkins, Oats filed a timely motion seeking to vacate his death sentence on the ground that he is intellectually disabled, and, ultimately, the circuit court held an evidentiary hearing on Oats's motion.

During the evidentiary hearing in this proceeding, the parties entered into a stipulation to admit the transcripts from the prior 1990 proceedings, as opposed to recalling all of the witnesses, and the circuit court agreed. Two additional mental health witnesses were presented: Dr. Denis Keyes and Dr. Harry McClaren. Dr. Keyes specializes in intellectual disabilities and teaches courses on the subject. He evaluated Oats in 2005, first administering the Stanford-Binet Intelligence Scale-5th edition. On this test, Oats received a nonverbal IQ score of 47, a verbal IQ score of 64, and a full scale IQ score of 54. Dr. Keyes testified that Oats's scores were consistent with having an intellectual disability.

Dr. Keyes further testified about Oats's deficits in adaptive functioning, discussing Oats's inability to hold a job on a long-term basis, his struggles to read, and how he always lived with family or friends who were able to assist him. He concluded that Oats's adaptive skills were deficient in practical, social, and conceptual ways and that his problems had existed back to his childhood.

As to the age of onset prong, Dr. Keyes interviewed numerous witnesses who knew Oats as a child, including Oats's brother and his cousin. Dr. Keyes also found and questioned Oats's fifth grade teacher, Florence McCrae, who described Oats as having significant intellectual deficits in virtually every area. According to McCrae, Oats "clearly had difficulty in learning" and needed the one-on-one attention that was typically available only in special education. He had to be placed in a special reading program for much younger children.

When Oats was 13, he was given the Slosson Intelligence Test, which indicated that Oats's IQ was 70—a score that qualifies as intellectually disabled. Based on Oats's score on this screening test, the school district should have performed additional testing, but none was given. However, as Dr. Keyes noted, this testing occurred prior to the federal mandate requiring state educational institutions to provide special accommodations for children with special needs, and Oats attended a socioeconomically disadvantaged school in the 1960s in Florida. In addition, Dr. Keyes discussed Oats's traumatic childhood, his head injuries as a

child, and how Oats was denied food as a child—all of which, he explained, could cause an intellectual disability.

On cross-examination, when asking about the manifestation prior to age 18 prong, the State recognized that this prong was "not really in play here," to which Dr. Keyes agreed:

Q: And the third component that, you know, is not really in play here too much either, I suppose, is the pre-18 onset, right?
A: Correct.

In contrast to Dr. Keyes's testimony, Dr. Harry McClaren reached a different conclusion. He administered the WAIS-III to Oats in October 2005. Oats's scores were similar to his prior intelligence testing scores: his verbal IQ score was 60, his nonverbal IQ was 72, and his full scale IQ was 62. While Dr. McClaren recognized that Oats's IQ scores had been incredibly consistent throughout the years, only varying by a few points, he was concerned whether the test was an underestimate.

As to deficits in adaptive functioning, Dr. McClaren recognized that Oats was never able to maintain employment for more than a few weeks, despite several attempts, and had always lived with family or friends. Further, Oats was never able to obtain a driver's license. All of these factors could be evidence of deficits in adaptive functioning, which would require concurrent deficits in at least two of the following areas: communication, self-care, home living, social/interpersonal

- 14 -

skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. Dr. McClaren recognized that while this is the definition as stated in the DSM, he did not assess this criteria under the DSM to determine whether Oats had deficits in two out of the ten areas. Dr. McClaren was sure that Oats currently has some adaptive deficits, but opined that this could be a more recent decline.

Dr. McClaren's most significant concern was whether sufficient evidence existed to establish that Oats's intellectual disability manifested prior to age 18. Dr. McClaren recognized that this prong is designed to differentiate an intellectual disability from other conditions that may also affect an individual's intelligence and adaptive functioning but that occur later in life, such as dementia. In this case, Dr. McClaren stressed that Oats was never "diagnosed" as having an intellectual disability while he was a child, testifying that there was no "psychiatric evidence of his subaverage intellect two standard deviations below the norm. The closest thing we have is a test called the Slosson test, which is not as good, not as suitable for classification of people as mentally retarded or not as a Wechsler or Stanford-Binet."

In discussing this prong, Dr. McClaren relied on a misreading of this Court's opinion in Cherry, which is no longer good law after Hall. Dr. McClaren explained his reasoning as to why the Slosson test was not sufficient to establish

- 15 -

onset prior to age 18 because, "taking into consideration we have the Cherry decision that talks about 70 means 70," Oats had only a "70 on a test that is not appropriate for the use of diagnosis of mental retardation." Also, contrary to what the Supreme Court would later hold in Hall, Dr. McClaren further noted that he uses more scrutiny in determining whether an intellectual disability exists in capital litigation.

Dr. McClaren did observe that this was a "very close" case, given the evidence of Oats's low IQ scores presently and in the past, his poor grades in school, and all of the head injuries and malnutrition Oats suffered during childhood. Dr. McClaren explained that whether Oats was intellectually disabled was unclear, though, because Oats was "undergoing pretty savage abuse and neglect" as a child and the environmental turmoil could have been the cause of a reduced performance on the Slosson Intelligence Test. Dr. McClaren also pointed out that recently, the Florida Department of Corrections had concerns as to whether Oats had an intellectual disability and also noted that Oats had a mild to moderate emotional impairment.

However, Dr. McClaren ultimately concluded that Oats does not have an intellectual disability, relying on Oats's lack of diagnosis before the age of 18, his ability to escape from custody prior to his trial and travel to New York, his letter writing, and his ability to have a three-month relationship with a woman in New

York. Dr. McClaren recognized, however, that questions remained as to how much Oats was able to accomplish by himself, as opposed to whether he was aided by others in accomplishing many of these tasks. Dr. McClaren acknowledged that his opinion differed from the prior mental health experts but explained this discrepancy by saying that there is more scrutiny given now in diagnosing intellectual disabilities, particularly in "capital litigation."

The circuit court denied Oats's motion on the basis that Oats failed to present sufficient evidence that his intellectual disability manifested before the age of 18. Oats appealed.

While the appeal was pending, the United States Supreme Court vacated this Court's decision in Hall v. State, 109 So. 3d 704, 711 (Fla. 2012), holding that this Court erred in applying the definition of an "intellectual disability" too strictly and that Florida's definition was unconstitutional because it "create[d] an unacceptable risk that persons with intellectual disability will be executed." Hall, 134 S. Ct. at 1990. This Court ordered the parties to submit supplemental briefing to address whether the decision in Hall impacted this case in any manner.

After consideration of the record, the briefs, and the supplemental briefs, we now conclude that the circuit court erred when it determined that Oats did not establish that his intellectual disability manifested prior to the age of 18. Accordingly, we reverse the circuit court's order and remand for the circuit court

- 17 -

to make additional findings after applying the recent Supreme Court decision in Hall and the correct legal standards.

## ANALYSIS

Oats raises five issues in this Court: (1) the trial court erred in denying his challenge to his sentence of death based on his intellectual disability; (2) Oats was deprived of his constitutional rights when the expert appointed by the trial court communicated directly with the State and did not act as a "court expert"; (3) the trial court improperly curtailed Oats's cross-examination of Dr. McClaren; (4) the trial court committed fundamental error by failing to act in a neutral manner during the evidentiary hearing; and (5) the burden of proof in section 921.137, determining whether a capital defendant is intellectually disabled, is unconstitutional. Because we conclude that the circuit court erred in its analysis of the intellectual disability claim and that Oats is entitled to a new evidentiary hearing with the benefit of Hall, we address only the first issue.

In reviewing the circuit court's determination that Oats is not intellectually disabled, "this Court examines the record for whether competent, substantial evidence supports the determination of the trial court." State v. Herring, 76 So. 3d 891, 895 (Fla. 2011). We "do[] not reweigh the evidence or second-guess the circuit court's findings as to the credibility of witnesses." Brown v. State, 959 So.

2d 146, 149 (Fla. 2007).  However, we apply a de novo standard of review to any questions of law.  Herring, 76 So. 3d at 895.

We begin our analysis by reviewing the relevant law and the impact of the United States Supreme Court's recent decision in Hall on Florida's standard in determining whether a defendant has an intellectual disability.  We then consider the errors in the circuit court's order.

### I. Atkins & Recent Supreme Court Precedent

Prior to the United States Supreme Court's 2002 holding in Atkins, Florida had already implemented a prospective prohibition on imposing the death sentence upon an intellectually disabled defendant.  See ch. 2001-202, § 1, Laws of Fla. (enacting § 921.137, Fla. Stat. (2001)).  Based on numerous considerations, including the trend within various legislative bodies to eliminate capital punishment for intellectually disabled defendants, the United States Supreme Court declared in Atkins that executing a person with an intellectual disability contravenes the Eighth Amendment.  Atkins, 536 U.S. at 318.  The Supreme Court further recognized that an intellectual disability consists of three prongs: (1) subaverage intellectual functioning; (2) significant limitations in adaptive skills; and (3) manifestation of the condition before age 18.  Id.  However, the Supreme Court did not elaborate as to how this standard was to be implemented and left this determination to the states, including "the task of developing appropriate ways to

enforce the constitutional restriction upon [their] execution of sentences." Id. at 317.

Once the Atkins ruling extended this protection to all capital defendants, this Court immediately implemented procedures to ensure that defendants could present evidence to establish whether they were intellectually disabled. In determining what constituted an intellectual disability, this Court looked to the statutory definition set forth in section 921.137(1), Florida Statutes (2002), and held that in considering whether a defendant had "subaverage intelligence," a defendant must establish an IQ score of 70 or less. Cherry, 959 So. 2d at 712-14. This Court further held that courts were precluded from considering the application of the standard error of measurement as to the IQ score. Id. at 712-13.

This Court was asked to reconsider Cherry's holding in Hall, 109 So. 3d at 707-08, a case that is substantially similar to the one before us now. In that case, Freddie Lee Hall had been previously found to have an intellectual disability, but since his crime occurred prior to Florida's statutory prohibition on imposing a sentence of death upon the intellectually disabled, such evidence was considered only as a mitigating circumstance. Id. at 706. Relying on the prior determination by the trial court that found Hall to be intellectually disabled, Hall sought relief after Atkins. Id. at 706-07. However, the postconviction court determined that Hall could not be considered intellectually disabled under Florida's statutory

definition of the term because Hall's IQ scores varied between 71 and 73 and thus did not constitute "subaverage intelligence." Id. at 707. In a 4-2 decision, this Court affirmed the postconviction court's finding of no intellectual disability based on the strict cut-off score of 70, as set forth in Cherry. Id. at 709-10.

The United States Supreme Court granted certiorari in Hall and held that the manner in which Florida defined an intellectual disability for capital litigation violated the Eighth Amendment because it "disregards established medical practice" and "creates an unacceptable risk that persons with intellectual disability will be executed." Hall, 134 S. Ct. at 1990, 1995. Specifically, the Supreme Court stated that Florida's bright-line rule

> disregards established medical practice in two interrelated ways. It takes an IQ score as final and conclusive evidence of a defendant's intellectual capacity, when experts in the field would consider other evidence. It also relies on a purportedly scientific measurement of the defendant's abilities, his IQ score, while refusing to recognize that the score is, on its own terms, imprecise.

Id. at 1995. In determining whether an interpretation of intellectual disability violates the Eighth Amendment, the Supreme Court relied on psychiatric and professional studies that elaborated on the purpose and meaning of the prong at issue. Id. at 1993. In addition, the Supreme Court stressed that a single factor should not be considered dispositive because the three factors must be considered together in an interrelated assessment. Id. at 2001 (relying on the DSM-5, at 37 ("[A] person with an IQ score above 70 may have such severe adaptive behavior

- 21 -

problems . . . that the person's actual functioning is comparable to that of individuals with a lower IQ score.")).

The United States Supreme Court emphasized these same principles in its most recent decision pertaining to the intellectual disability analysis, in which the Court held that the defendant was entitled to an evidentiary hearing on his intellectual disability claim. See Brumfield, 135 S. Ct. at 2279. The Supreme Court first reiterated that an IQ test result of 75 is "entirely consistent with intellectual disability," relying on its prior decision in Hall. Id. at 2277. The Supreme Court then addressed the next two prongs, determining that the record contained "substantial grounds to question [the defendant's] adaptive functioning," based on numerous examples from the defendant's childhood, including his low birth weight, that he was placed in special classes in the fifth grade, and that he had difficulty processing information. Id. at 2280. Further, the Supreme Court noted that the evidence pertaining to his low birth weight and his intellectual shortcomings as a child provided "ample evidence" that the defendant's disability manifested before adulthood and thus required an evidentiary hearing so that the trial court could hear all relevant evidence and determine whether the defendant is intellectually disabled. Id. at 2283.

## II. Errors in the Circuit Court's Order

Considering the circuit court's order in light of this precedent, we reverse for three reasons.  First, while we recognize that the circuit court did not have the benefit of Hall, the Supreme Court has now stated that courts must consider all three prongs in determining an intellectual disability, as opposed to relying on just one factor as dispositive.  Hall, 134 S. Ct. at 2001.  We conclude that the circuit court erred in relying solely on the third prong in denying Oats's claim.

We caution, however, that our decision should not be interpreted as establishing that this will necessarily constitute a per se reversible error.  But as the Supreme Court has now recognized, because these factors are interdependent, if one of the prongs is relatively less strong, a finding of intellectual disability may still be warranted based on the strength of other prongs.  Id. (holding that this is a "conjunctive and interrelated assessment" and relying on the DSM-5, which provides as an example that "a person with an IQ score above 70 may have such severe adaptive behavior problems . . . that the person's actual functioning is comparable to that of individuals with a lower IQ score").

Second, the circuit court erred in concluding that Oats failed to meet his burden without even considering or weighing all of the testimony that Oats presented.  The circuit court agreed to the parties' stipulation to consider the mental health evidence presented in the 1990 proceedings pertaining to whether Oats had an intellectual disability, as opposed to requiring the parties to recall all

- 23 -

of those witnesses who testified previously regarding Oats's intellectual disability. However, in reaching its decision, the circuit court stated that it "accept[ed]" the 1990 postconviction court's ruling and was "not in a position to reevaluate the credibility of the witnesses who testified or the evidence" the postconviction court considered in those prior proceedings. The circuit court then denied Oats's claim, concluding that "[t]here is no competent evidence that the defendant suffered from any mental retardation prior to the age of 18."

The circuit court's refusal to consider the 1990 evidence of Oats's intellectual disability was error. The prior proceedings did not determine whether Oats is intellectually disabled under the statutory definition and thus ineligible for the death penalty, as the circuit court itself recognized. The case was in a different procedural posture at that time, particularly since the bar against the execution of an intellectually disabled individual did not then exist. If the circuit court, after reviewing the transcripts, determined that it was unable to evaluate the credibility of the witnesses or consider the evidence submitted in the prior postconviction proceedings, it was required to permit the parties to recall those witnesses in a new proceeding and submit the evidence so that all of the relevant evidence could be considered and weighed.

In fact, in the 1990 postconviction proceedings, Oats submitted so much evidence establishing his intellectual disability that the State, in its written closing

argument to the postconviction court, stated, "Under the DSM-III criteria, the defendant falls in the mildly mentally retarded area. No doubt about that." Thus, this evidence clearly should have been considered in the current proceeding.

Finally, reversal is warranted because the circuit court applied the incorrect legal standard in analyzing whether Oats's intellectual disability "manifested during the period from conception to age 18." § 921.137, Fla. Stat. As the American Association on Intellectual and Developmental Disabilities explains, an intellectual disability is a developmental disability and thus this prong ensures that there was "evidence of the disability during the developmental period." Am. Ass'n on Intellectual & Developmental Disabilities, Definition of Intellectual Disability http://aaidd.org/intellectual-disability/definition#.VNDqAyvF-JQ (last visited December 2, 2015). Likewise, the United States Supreme Court has recognized that this prong simply requires that a defendant demonstrate that his "intellectual deficiencies manifested while he was in the 'developmental stage'—that is, before he reached adulthood." Brumfield, 135 S. Ct. at 2282.

In concluding that "[t]here is no competent evidence that the defendant suffered from any mental retardation prior to the age of 18," the circuit court rested solely upon the testimony by the State's expert witness, Dr. McClaren, that Oats had a "[l]ack of diagnosis before 18"—testimony that the circuit court quoted in denying relief:

Well, because, first look at the onset prior to age 18. We don't have any psychiatric evidence of his subaverage intellect two standard deviations below the norm. The closest thing that we have is a test called the Slosson, S-l-o-s-s-o-n, test, <u>which is not as good, not as suitable for classification of people as mentally retarded or not as a Wechsler or Stanford-Binet</u>.

Also, that test was given at age 13, when he was by all accounts, undergoing pretty savage abuse and neglect and probably questioning his paternity and who his mother and father were.

. . . .

<u>Lack of diagnosis before 18</u>, even though there was some evidence that he had been identified with the screening tests with an IQ of 70. He is able to progress through school, despite having a very physically abusive and probably very confusing upbringing.

(Emphasis added.) The circuit court did not reject the expert witness testimony presented by Oats in this proceeding or find that any of that testimony was not credible. Instead, the circuit court simply accepted Dr. McClaren's position that, although the intelligence test given to Oats as a child produced an IQ score of 70, this test could not be relied upon to establish the manifestation of intellectual disability before age 18 because this test was "not as good . . . as a Wechsler or Stanford-Binet" and was not suitable by itself to <u>diagnose</u> a person as having an intellectual disability.

Contrary to the circuit court's decision, section 921.137 requires a showing only that an intellectual disability "<u>manifested</u> during the period from conception to age 18." § 921.137, Fla. Stat. (emphasis added). The term "manifest" means "[t]o show or demonstrate plainly." <u>The American Heritage Dictionary</u> 1067 (5th ed. 2011). Accepting the position that "manifested" equates to "diagnosed" would

- 26 -

render the first two prongs of the statutory test for an intellectual disability moot, as the only way to find an intellectual disability would be if the diagnosis already existed by the age of 18.

Moreover, this Court has never held that the defendant must have been given a specific IQ test prior to the age of 18 in order to find an intellectual disability. That inflexible view would not be supported by the United States Supreme Court's recent enunciations in Hall and Brumfield. See Brumfield, 135 S. Ct. at 2282 (stating that this prong merely requires that a defendant demonstrate that his intellectual deficiencies manifested "before he reached adulthood"); Hall, 134 S. Ct. at 1994 (recognizing that, based on a consensus within the medical community, this prong simply requires the "onset of these deficits during the developmental period"). As even Dr. McClaren himself recognized, the purpose of requiring the manifestation of an intellectual disability prior to age 18 is to distinguish an intellectual disability, which a person must have had as a child, from other conditions that may cause an individual's intelligence and adaptive functioning to decline later in life, such as dementia. In other words, a person cannot acquire an intellectual disability after childhood.

It appears that Dr. McClaren's view may have been impacted by a misreading of this Court's prior opinion in Cherry. Specifically, when Dr. McClaren was asked with more specificity as to why he did not find onset prior to

age 18, Dr. McClaren testified that while Oats was given a Slosson IQ screening test at age 13, this was not sufficient to establish onset prior to age 18 because he had to "tak[e] into consideration we have the Cherry decision that talks about 70 means 70." He concluded that Oats had only a "70 on a test that is not appropriate for the use of diagnosis of mental retardation." Of course, our holding in Cherry did not address onset before age 18, and the inflexible "70 means 70" rule of Cherry has now been overturned by the United States Supreme Court in Hall.

Accordingly, as a result of these legal errors, the circuit court incorrectly evaluated Oats's claim under the wrong standard. In fact, the evidence pertaining to the onset prior to age 18 prong is comparable to that in Hall, another case in which all of the parties previously recognized that the defendant suffered from intellectual disability—a premise that was challenged only after Atkins barred the execution of those with an intellectual disability.

Specifically, in Hall, 134 S. Ct. at 1990-91, as it relates to the age of onset prong, the United States Supreme Court noted that Hall's teachers identified Hall as being intellectually disabled on numerous occasions and that his siblings testified that there was "something 'very wrong' with [Hall] as a child" and he was "slow with speech and . . . slow to learn." Moreover, in a strikingly similar manner to this case, Hall bore the brunt of physical abuse within the family and his mother constantly beat him because Hall was slow and made simple mistakes. Id. at 1991.

Based on that type of evidence, the Supreme Court noted that the age of onset factor was not even "at issue" in that case. Id. at 1994. See also Van Tran v. Colson, 764 F.3d 594, 613-14 (6th Cir. 2014) (remanding for a new evidentiary hearing because the state postconviction court erroneously relied on the absence of any test of intellectual functioning before the age of 18 and discounted the fact that the defendant's childhood was marked by certain impairments during the developmental period, including his delay in reaching various milestones, because a multitude of factors could have caused those delays).

Similarly, evidence presented in this case establishes that Oats was slow to reach important developmental milestones, and based on accounts from Oats's siblings and teachers, Oats was very slow and constantly struggled to understand basic concepts and needed the type of one-on-one interaction that was available only in special education. Further, like in Hall, Oats was subjected to abuse based on his lack of ability to understand requests from his foster parents.

In its decision in Hall, the Supreme Court clarified that the appropriate definition to use in determining whether an intellectual disability exists is the definition that is used by skilled professionals in making this determination in all contexts, including those "far beyond the confines of the death penalty," such as special education, medical treatment plans, and access to social programs. 134 S. Ct. at 1993. Based on certain aspects of Dr. McClaren's testimony, it is unclear

whether he employed a heightened standard because this is a capital case, as opposed to the standard that would normally apply to determine an intellectual disability in other contexts. However, the record clearly shows that Dr. McClaren was influenced by his misreading of Cherry and imposed additional requirements not recognized by the DSM—requirements that have since been explicitly disapproved. Thus, we direct the circuit court to permit the parties an opportunity for a new evidentiary hearing so that the parties may present additional evidence, including whether the experts' opinions have changed from when they initially made their conclusions or have been otherwise affected by Hall, Brumfield, and other developments in the law.

## CONCLUSION

For all these reasons, we conclude that the circuit court erred in determining that Oats failed to establish onset of his intellectual disability prior to the age of 18. The evidence presented to the circuit court in fact strongly leads to the conclusion that Oats established both his low IQ and onset of an intellectual disability prior to the age of 18. However, because the circuit court did not analyze the remaining prongs, and because neither the circuit court nor the parties and their experts had the benefit of Hall, we remand for further proceedings consistent with this opinion, including providing the parties with an opportunity to present additional evidence

at an evidentiary hearing to enable a full reevaluation of whether Oats is intellectually disabled.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, and PERRY, JJ., concur.
CANADY and POLSTON, JJ., concur in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Marion County,
        Hale Ralph Stancil, Judge - Case No. 421980CF000016AXXXXX

Neal Andre Dupree, Capital Collateral Regional Counsel, Southern Region, Martin J. McClain, Special Assistant, Capital Collateral Regional Counsel, Southern Region, and Michael Chance Meyer, Staff Attorney, Capital Collateral Regional Counsel, Southern Region, Fort Lauderdale, Florida,

        for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and James Donald Riecks, Assistant Attorney General, Daytona Beach, Florida,

        for Appellee