GROSS, J.
Floyd Persaud appeals his convictions of two counts of manslaughter by culpable negligence and three counts of culpable negligence. See §§ 782.07(1), 784.05(2), Fla. Stat. (1999). We affirm, and write to address one issue.
Persaud was charged along with co-defendant Joseph Conti. The state’s theory of the case was that the defendants were high speed drag racing on a public street, resulting in a five ear collision causing the deaths of Eugene and Virginia Bartosik and serious personal injuries to Carole Leffler and her children, Melissa and Paul. Prior to trial, Conti pled guilty to one count of DUI manslaughter and was sentenced to 20 years in prison. At the time of the accident, Conti had a blood alcohol level of .20%; Persaud tested negative for the presence of alcohol or any other intoxicant.
On appeal, Persaud challenges the trial court’s refusal, during the state’s case, to permit questioning of the traffic homicide investigator about Conti’s blood alcohol level at the time of the accident. To properly analyze this issue, it is necessary to review not only the testimony at trial, but also the time during the trial when the trial court was asked to rule on the admissibility of Conti’s blood alcohol level.
The fatal crash occurred on October 4, 1997 on Lake Worth Road, just west of Military Trail in suburban Palm Beach County. Running east to west, Lake Worth Road is a six-lane, divided highway. See § 316.003(53)(a), Fla. Stat. (1999). A raised concrete median divides eastbound and westbound lanes. In the area of the accident, the speed limit is 40 miles per hour; one half mile west of the accident scene the speed limit changes to 45 miles per hour. Persaud was driving a teal, 1992 Camaro with a V6 engine; Conti was driving a dark green, 1992 Camaro with a V8 engine.
The state’s witnesses all supported the state’s theory that Persaud and Conti were drag racing.
While traveling east on Lake Worth Road, Patricia Smith first observed the defendants’ Camaros about a mile and a half west of the accident site. Smith was driving in the curb lane. Both Camaros passed her in the middle lane. She testified that the two cars “whizzed passed [sie][her] one right behind the other, just like they were connected, and they were switching from lane to lane.” The Cama-ros stopped at a red light at Haverhill Road, three tenths of a mile west of the accident site. When the light changed to green, both cars “just floored it” and “were gone.” Smith heard loud noises, as if the drivers of the Camaros were “revving the engines,” and described the driving as “racing.” The next thing Smith observed was the teal Camaro flying up in the air and a cloud of dust.
Harold Allen was also traveling east on Lake Worth Road in the curb lane. The two Camaros passed him in the center lane going “[sjomewhere between 60 and 70.” Allen observed the teal Camaro changing lanes in order to avoid hitting other cars. It appeared to Allen that the two vehicles may have been racing.
While waiting in the parking lot of Bud’s Chicken to turn right and head east on Lake Worth Road, Donald Mousel first saw the two Camaros east of the Haverhill Road intersection. He testified that the cars were traveling very fast and he heard loud engine noises. Mousel said that *152 “they were shifting, down shifting, up shifting, they were racing.” He saw the cars traveling side by side, with the teal Camaro being a little bit ahead of the darker one. Mousel estimated that the cars were traveling between 50 and 60 miles per hour. He never lost sight of them, and saw the dark green car strike the teal one on the right rear bumper. The lighter Camaro hit the median, went airborne, and crashed through the windshield of another car. The dark green Camaro ended up straddling the median.
Susan Rasmus was on her bicycle in the parking lot of Bud’s Chicken. She noticed the two Camaros side by side, drag racing and could hear the engines accelerating.
Darryl Stenzel was traveling east on Lake Worth Road in the left hand lane. As he approached the Military Trail intersection, he began to slow down to about 40 miles per hour. After his fiancé yelled “watch out!,” Stenzel noticed “two cars coming up on my right and skidding”; the cars were so close that they appeared to be attached to each other. Stenzel hit his brakes, and the two cars went by him, just missing his car. He saw the darker Cama-ro hit the teal one, sending it flying through the air. The teal Camaro landed on a white car, skidded across the roof of a red car, and finally came to rest upside down in the westbound side of the road.
After Stenzel, the state called three witnesses[1] who had been traveling west on Lake Worth Road just prior to the accident. These witnesses did not see the defendants’ driving prior to the collision. Two other witnesses [2] first saw the Cama-ros only a short time before the accident, so they could offer little about the defendants’ conduct before the crash. Two sheriffs deputies and a paramedic described the carnage they observed when they arrived at the accident scene.
At this point in the trial, the state called Deputy Todd Evans, the traffic homicide investigator assigned to the case. Based on his investigation, Evans concluded that Conti’s Camaro had struck Persaud’s vehicle. Both cars began to rotate counterclockwise. Conti’s car hit the median and stopped. Persaud’s Camaro struck the median, became airborne, and struck the Bartosiks’ vehicle; then it turned upside down, went backwards, and hit the Lef-flers’ Mitsubishi Mirage. Evans opined that it was the contact between the vehicles, as well as their speed, which caused Persaud’s car to rotate. He calculated Conti’s post-impact speed to be 57 miles per hour and Persaud’s to be 66 miles per hour. Evans testified that the accident would not have occurred had Persaud been traveling at the speed limit, even if his car had been bumped in the same way.
On cross-examination, Persaud’s attorney sought to question Evans about Con-ti ’s physical condition at the accident scene. The state objected. Outside the presence of the jury, the defense argued that its theory of the case was that the accident was caused by Conti because he was intoxicated and lost control of his vehicle; but for Conti striking Persaud’s car, the accident would not have happened. The trial judge sustained the state’s objection to the testimony and explained his ruling:
Quite frankly, it seems to me that what the defense would like to do is paint one guy as being worse than your guy. I mean, say, hey, throw your anger at this guy, because, hey, he was drinking, don’t throw your anger at my guy, because he wasn’t. I just think that opens up an issue that doesn’t really exist in the case that I can see.
[[Image here]]
I will maintain my ruling. I don’t believe that the issue of the other driver’s state, mentally or physically, is relevant or material to the issues in this trial.
*153 I agree that the defense is entitled to bring to the juries [sic] attention the causation of Mr. Persaud’s car going out of control the way it did, being the collision that was caused by Mr. Conti’s car coming into contact with the rear side of it. But Mr. Conti’s physical or mental condition at the time that contact took place is not an issue for this jury to consider and I will not allow that testimony to be produced.
After the state rested, Persaud took the stand. He said he was 27 years old and single. He lived with his parents in Royal Palm Beach. He had worked for the tax collector for the last ten years. He owned a 1992 Camaro with a six cylinder engine which was not “souped up” in any way.
At about 6:30 p.m. on the evening of the accident, Persaud said that he left home to go to his girlfriend’s house in Lake Worth. On Lake Worth Road, he was traveling 45 to 55 miles per hour, along with the flow of traffic. He did not see a dark green Ca-maro. Prior to the accident, he did not know Conti. Between Haverhill Road and Bud’s Chicken, Persaud moved from the left lane into the center lane in anticipation of making a right hand turn onto Military Trail at the next intersection.
Persaud denied racing with anybody or being aware that anyone was competing with him. His version of the accident was that his car was hit on the right side when Conti’s vehicle came from the right lane. He disagreed with Deputy Evans’s version of the accident and claimed that there was no way that he could have been traveling at 66 miles per hour because of the amount of traffic on the road. Persaud remembered trying to take evasive action as he perceived Conti trying to pass between him and another car. He felt a bump and then everything was a blur. He remembers waking up pinned in his car, which was upside down.
Significantly, after Persaud testified, he did not seek to offer any evidence concerning Conti’s physical condition at the time of the accident.
As we have noted above, Persaud argues that the trial court erred by not allowing him to introduce evidence of Conti’s intoxication at the time of the accident.
Persaud first sought to introduce evidence of Conti’s lack of sobriety during cross-examination of a witness during the state’s case. The state’s theory of culpable negligence was that Conti and Persaud were drag racing at excessive speeds on a busy public highway. A serious traffic accident is a likely consequence of such conduct. At the time Persaud broached the issue of Conti’s physical condition, the only evidence pertaining to Persaud’s culpable negligence was that the two Cama-ros had been drag racing at high speeds. Whether Conti was inebriated during the drag race was not relevant to the issue of Persaud’s guilt, since it was Persaud’s participation in the high speed race, not the other driver’s physical condition, that formed the basis of Persaud’s guilt. Per-saud’s involvement in the drag race was not rendered less egregious because Conti later turned out to be intoxicated.
For these reasons, the evidence of Conti’s intoxication had no probative value on the issue of Persaud’s culpable negligence at the time the defense sought to introduce it. The trial court’s ruling was based on section 90.403, Florida Statutes (1999), which provides that even
[rjelevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.
The danger the trial judge perceived was that the jury might place undue emphasis on Conti’s lack of sobriety in deciding whether Persaud was culpably negligent. “Where a trial court has weighed probative value against prejudicial impact before reaching its decision to admit or exclude evidence, an appellate court will not overturn that decision absent a clear abuse of *154 discretion.” Trees By and Through Trees v. K-Mart Corp., 467 So.2d 401, 403 (Fla. 4th DCA 1985).
The record reveals that the trial court engaged in a thoughtful evaluation of the admissibility of Conti’s intoxication. The resulting decision not to admit the evidence was neither arbitrary nor cursory. The court’s weighing of the probative value of the evidence against the danger of unfair prejudice or misleading the jury was, at the very least, a matter about which reasonable people could differ. Applying Trees, there was no abuse of discretion in the trial court’s decision to exclude the evidence during the state’s case.
However, once Persaud took the stand, the landscape of the trial changed dramatically. Trials are fluid proceedings where evidentiary rulings are subject to change depending upon the state of the evidence presented at the time the court is asked to rule.
Persaud’s defense was that he was not drag racing, that he was moving with the flow of traffic, and that Conti came out of nowhere to cause the accident. Once introduced into evidence, these facts made Conti’s inebriation relevant to support Per-saud’s version of events and to explain the accident by showing that Conti was at fault for causing it. “[Wjhere evidence tends in any way, even indirectly, to establish a reasonable doubt of defendant’s guilt, it is error to deny its admission.” Rivera v. State, 561 So.2d 586, 539 (Fla.1990) (citation omitted); Vannier v. State, 714 So.2d 470, 471-72 (Fla. 4th DCA 1998) (quoting Rivera).
Even so, we affirm because Persaud failed to preserve this issue for appeal by failing to reoffer the evidence of Conti’s sobriety during the defense case, once Per-saud’s testimony had made that evidence relevant to his defense. See §§ 90.104(l)(b), 924.051(3), Fla. Stat. (1999). One aspect of preservation of an issue for appeal is that it be “timely raised before, and ruled on by, the trial court.” § 924.051(l)(b), Fla. Stat. (1999). As it applies to this case, “timeliness” means not only that evidence was offered at trial, but that it was offered at a time during the trial when the facts before the judge compelled its admission.
AFFIRMED.
WARNER, C.J., and SHAHOOD, J., concur.

ON MOTION FOR CLARIFICATION

GROSS, J.
We grant appellant’s motion for clarification noting that Persaud’s appellate counsel was not counsel for him at trial.
WARNER, C.J., and SHAHOOD, J., ' concur.

. William Mellon, Carole Leffler, and Keith Sutcliffe.

. Amanda Prevost and Pilar Ananos.