# Supreme Court of Florida

_____

No. SC15-1578
_____

**DENNIS T. GLOVER,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[September 14, 2017]

PER CURIAM.

Dennis T. Glover appeals his conviction for first-degree murder and his sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons below, we affirm Glover's conviction but vacate his sentence and remand for a new penalty phase.

## BACKGROUND

The evidence presented at trial established that Glover, Brenda LaCounte, Mary and Daryl Alvin, and the victim, Sandra Allen, were all neighbors on a dead-end street in Jacksonville, Florida, with LaCounte and Allen living across from

each other at the dead end.  On the morning of May 30, 2012, at approximately 7 a.m., while sitting on her front porch, LaCounte saw a dark-skinned black male of medium height, generally matching Glover's description, enter the front door of Allen's trailer.  The man did not come back outside during the approximately fifteen minutes that LaCounte remained on her porch.  That same morning, Mary Alvin (Mary) saw Glover walk past her house toward the dead end of their street three separate times: the first time between 8 and 9 a.m., the second time somewhat later, and the final time between 10 and 11 a.m.  Neither LaCounte nor Mary saw anyone else or any vehicles on their street that morning, although according to Mary, there were generally "[a]lways vehicles going back and forth from [Allen's] residence."

Shortly after the third time that Mary saw Glover walk past her house toward the dead end of the street, Glover rang her doorbell.  "[H]ollering" and "in distress," Glover told Mary and her husband, Daryl Alvin (Daryl), that "somebody's killed Jeremy's mom," referring to the victim, Sandra Allen.  When the Alvins, accompanied by Glover, ran across the street to the victim's trailer (which she shared with one of her daughters), they found the front door pushed open and the victim lying on the floor near the front door, on her back, naked from the waist down, her shorts and underwear around her right ankle, with blood coming out of the back of her head.

After entering the trailer to try and render aid to the victim, and touching the victim's neck but finding no pulse, Daryl became concerned that the victim's daughter might also be in danger, so he searched the trailer and determined that she was not at home.[1]  While Daryl was inside the trailer, Mary remained on the porch with Glover, who did not enter the trailer.  Mary observed no bloody footprints on the porch, and Daryl did not get any blood on his shoes or clothing while he was inside the trailer.

Law enforcement responded to the scene following a 911 call.  The ensuing investigation revealed Glover's touch DNA on the victim's head, neck, and left hand, the victim's blood in fourteen different locations on the tops of Glover's shoes (which were photographed and inspected the day the victim's body was found but not collected until the following day), and no bloody footprints at the crime scene visible to the naked eye or with an alternate light source.  Glover was arrested and charged with Allen's first-degree murder.

At trial, the medical examiner testified that the victim's cause of death was exsanguination resulting from stab wounds to her neck, but that strangulation also

---

1.  The victim's daughter, Joyce Allen, would later confirm that she last spoke with her mother on the telephone between 9 and 9:30 p.m. the evening before and that the victim "sounded fine."  As the last known person to speak with the victim before her murder, Joyce's testimony established an approximate thirteen-hour window during which the murder could have been committed, from 9:30 p.m. on May 29, 2012, through 10:30 a.m. on May 30, 2012.

contributed by depriving the victim of oxygen and making it easier and quicker for her to die. More specifically, the victim was stabbed twelve times in the front of her neck, likely by a single-edged knife,[2] and had several blunt force injuries to the same area, along with several scrapes and abrasions. Four of the stab wounds were fatal, severing the victim's jugular vein and cutting her carotid and vertebral arteries. In addition, the victim was manually strangled with enough force to break her hyoid bone, fracture her thyroid cartilage, and crush her voice box. Although the medical examiner testified that there were no injuries on the victim's hands, there were cuts in her shirt that did not correspond to wounds on her body, indicating either that her shirt was bunched up, with a few stabs creating multiple holes, or that her shirt was pushed up around her neck, where she was stabbed multiple times. The medical examiner testified that the victim sustained all of her injuries at or near the same time and that it would have taken a small number of minutes or a large number of seconds for her to die.

In addition to the medical examiner's testimony regarding the victim's clothes, Glover's own bloodstain and blood spatter expert testified to evidence evincing a struggle. Specifically, Glover's expert testified that the blood flowed from the victim's injuries while she was in different positions and that blood

2. The murder weapon was not recovered.

- 4 -

spatter low on a wall indicated that the victim sustained some of her injuries in a position between standing up and lying down.

Although the medical examiner testified that there were no injuries to the victim's vagina or anal area, the DNA expert testified that a trace amount of semen was present on the victim's genital swab, but it was not enough material to test. In addition to Glover's touch DNA on the victim's head, neck, and left hand, which the DNA expert testified was not likely left by casual contact, the DNA expert testified that although there was a DNA mixture on the victim's right hand with three contributors (one of whom she expected to be the victim), the sample was not sufficient for testing and therefore could not exclude or include anyone.[3] The DNA expert further testified that of the six hairs found on the victim, DNA testing was performed on the one from her vaginal swab, which was found to match the victim, but that testing was not performed on any of the other hairs in light of the blood and touch DNA evidence of higher probative value. The DNA expert confirmed that other environmental items, such as soda cans, cups, cigarette butts, a glove, and tools were collected from the scene but not tested.

Faced with the State's circumstantial case against Glover, in his opening statement, defense counsel foreshadowed what was to be Glover's reasonable

---

3. One of the first officers to arrive on the scene testified that he checked the victim's right wrist for a pulse.

hypothesis of innocence: that the DNA evidence connected Glover to the victim but not to her murder. More specifically, defense counsel argued that the evidence would show that Glover and Allen were involved in a sexual relationship and had sexual contact the morning of her murder; that Glover left the victim alive after she told him she was expecting visitors; that Glover later heard a scream or commotion from the area of the victim's trailer, looked that way, and saw two African American individuals run from the victim's home, get into a vehicle, and drive away; that Glover then went to the victim's home and found the front door ajar and the victim lying on the floor with blood pooling around her, some of which got on his shoes; and that Glover then ran over to the Alvins' home.

In support of his explanation for the victim's blood on his shoes, Glover presented the testimony of a forensic consultant and expert in crime scene reconstruction, bloodstains, and blood spatter analysis. Glover's expert testified that in addition to the possibility that the victim's blood got on Glover's shoes when he murdered the victim, there were two innocent possibilities: first, that Glover stepped in blood when he found the victim, blood splashed on his shoe, and the blood continued to pool and covered his footprint, or, second, that an item dropped in the pooled blood and splashed his shoes when Glover found the victim. Regarding the possibility that Glover innocently stepped in the victim's blood, Glover's expert acknowledged that there was no evidence of Glover's leaving a

footprint when he stepped out of the blood as would have been expected, but the expert also faulted law enforcement for failing to use luminol or amido black in addition to the alternate light source that law enforcement used to look for footprints. Regarding the two items that could have dropped into the victim's blood—a shoe and a pair of eyeglasses—Glover's expert testified that he did not see anything that would allow him to testify "with certainty" that the shoe was dropped in the blood, and while he also could not "totally rule it out," he would not expect the glasses to be heavy enough to generate the spatter present on Glover's shoes.

The defense rested without presenting or eliciting on cross-examination any evidence establishing a relationship between Glover and Allen or placing him in her home prior to the murder. To the contrary, Allen's daughter, who lived with Allen but was away from home when the murder occurred, testified that Allen did not "have any kind of relationship with [Glover]" and that, to her knowledge, Glover had never been inside their home. Before the defense rested, Glover exercised his right not to testify after inquiry by the trial court, during which Glover confirmed that he understood "there [would] be no other evidence presented."

On December 12, 2013, Glover's jury found him guilty of first-degree premeditated murder.[4]

During the penalty phase, the State introduced Glover's three prior felony convictions from the State of Georgia for a 1984 attempted armed robbery and aggravated assault (during which Glover shot at the victim) and a 1992 aggravated assault (during which Glover assaulted the victim with a wrench). The State also presented victim impact testimony of four of the victim's family members and several photographs of the victim, both alone and with family members.

Glover presented the testimony of his fiancée and numerous family members, including five of his seven living siblings. Glover's counsel further read into the record several letters from Glover to his biological daughter, with whom he had reunited following his arrest; a letter from Glover's biological daughter to the court; and a report establishing Glover's lack of disciplinary issues while in jail awaiting trial.

Glover also presented testimony of a doctor of family medicine, Dr. Jossie Burton, who never personally treated Glover but worked for the clinic where Glover received treatment from July 2009 through February 2012. Dr. Burton relied on her office's records to testify that Glover had bipolar disorder, diabetes,

---

4. The jury was not instructed on felony murder.

and hypertension and that he had problems sleeping and with pain. Dr. Burton further testified that in addition to medication for his diabetes and hypertension, Glover had been prescribed medication to treat his mood disorder. Dr. Burton testified that Glover's prescriptions, including his bipolar medications, were refilled at his last visit, in February 2012 (approximately three and a half months before the victim's murder).

In addition to Dr. Burton, Glover presented the testimony of forensic psychologist Dr. Jerry Valente, who testified that Glover "falls on the cusp of the borderline to intellectually disabled range" based upon a full-scale IQ score of 72 that Glover achieved on a 2013 IQ test. Dr. Valente further diagnosed Glover with borderline intellectual functioning, polysubstance dependence, psychoactive substance abuse, bipolar disorder, major depression recurrent with psychotic features, and borderline personality (but not rising to the level of borderline personality disorder).

The State did not present any rebuttal testimony. Following inquiry by the trial court, Glover waived his right to testify to his penalty phase jury.

On December 20, 2013, the jury recommended the death penalty by a vote of ten to two.

A <u>Spencer</u>[5] hearing was held on March 7, 2014, at which Glover presented one witness who verified that Glover still had not received any disciplinary reports from the jail. In addition, defense counsel filed several records with the court, including Dr. Valente's forensic report, Glover's school records, mental health records from several different facilities, five letters from Glover evincing his loving relationship with his biological daughter, and Glover's substance abuse class attendance card from the jail. Thereafter, defense counsel presented a brief legal argument asking the court to consider Glover's impoverished upbringing and lack of role models, connections with his loving family, and his mentoring of younger jail inmates, along with other issues that would be addressed in the defense sentencing memorandum.

Glover, who had not previously testified, also made the following statement: "I want to state for the record that I still maintain my innocence, but I want to express my sympathy for the victim and their family because that was a great loss to them. That's all I have to say."

The State presented no evidence or argument but stated that it would be submitting a sentencing memorandum.

---

5. <u>Spencer v. State</u>, 615 So. 2d 688 (Fla. 1993).

Approximately one month after the sentencing memoranda were filed, the United States Supreme Court issued its decision in Hall v. Florida, 134 S. Ct. 1986 (2014), invalidating Florida's bright-line rule precluding defendants with IQs above 70 from establishing intellectual disability as a bar to execution. In light of Hall, defense counsel filed a motion for a new penalty phase or, alternatively, to reopen the Spencer hearing to address intellectual disability. Defense counsel also subsequently filed a notice alleging that Glover's intellectual disability barred his execution. The trial court denied Glover's request for a new penalty phase but granted his request to reopen the Spencer hearing.

By this time, Glover's relationship with his defense counsel had deteriorated, and Glover's refusals to meet with his defense counsel or submit to additional mental health evaluations complicated the progress of the reopened Spencer hearing. Despite urging from both defense counsel and the trial court, Glover never submitted to an evaluation by his or the State's mental health expert for purposes of providing additional information relevant to his intellectual disability claim. Ultimately, however, three additional hearings were held as part of the reopened Spencer hearing, on August 21, 2014, and May 1 and May 29, 2015, at which the trial court heard testimony from one of Glover's brothers, Glover's mental health expert Dr. Larry Neidigh, and the State's mental health expert, Dr. Gregory Prichard. Glover's expert testified that he could not

definitively say that Glover is intellectually disabled, and the State's expert

testified that Glover is not intellectually disabled.

Thereafter, in a detailed sentencing order, the trial court found that Glover is

not intellectually disabled, concluded that the aggravating circumstances[6]

outweighed the mitigating circumstances,[7] and sentenced Glover to death in

accordance with the jury's recommendation.

_____

6. The trial court found the following aggravating circumstances and assigned them both great weight: (1) prior violent felony based on Glover's three prior violent felony convictions; and (2) the capital murder was especially heinous, atrocious, or cruel.

7. The trial court found no statutory mitigating circumstances and the following nonstatutory mitigating circumstances, to which it assigned the noted weight: (1) Glover has the opportunity to become involved in his biological daughter's life (slight weight); (2) Glover encouraged both his daughters to work hard and achieve all the goals they set for themselves (partially established as to one daughter and given slight weight); (3) Glover encouraged his biological daughter to strive to own her own business (slight weight); (4) Glover can guide his daughters and grandchildren emotionally and spiritually while he is incarcerated (partially established as to one daughter and given slight weight); (5) Glover's daughters intend to continue and maintain a relationship with their father while he is incarcerated (partially established as to one daughter and given slight weight); (6) Glover loves his daughters, and his daughters love him (partially established as to one daughter and given slight weight); (7) Glover is a hard worker (moderate weight); (8) Glover's siblings express mutual love for one another (slight weight); (9) Glover has the capacity to form loving relationships (slight weight); (10) Glover and his siblings love one another and will maintain a relationship with him while he is incarcerated (slight weight); (11) Glover's father walked out on the family (some weight); (12) Glover, his siblings, and his parents have been diagnosed with mental illness (some weight); (13) Glover suffered from physical abnormalities because he was born cross-eyed (slight weight); (14) Glover's father was in and out of mental institutions throughout his life (slight weight); (15) Glover's parents were alcoholics (slight weight); (16) Glover did not

## ISSUES ON APPEAL

Glover raises the following guilt phase issues on appeal: (1) whether the evidence is sufficient to support his conviction; (2) whether the trial court erred in excluding evidence of the victim's drug use; (3) whether pretrial complaints Glover made about discovery and communication with defense counsel should have triggered an inquiry into counsel's effectiveness pursuant to Nelson v. State, 274 So. 2d 256 (Fla. 4th DCA 1973); and (4) whether defense counsel was ineffective. As the fifth and sixth issues, we review two more of Glover's claims, namely, whether the trial court erred in finding that Glover is not intellectually disabled and whether Glover is entitled to relief pursuant to Hurst v. State, 202 So. 3d 40 (Fla. 2016), cert. denied, 137 S. Ct. 2161 (2017).[8]

---

have a strong role model growing up (slight weight); (17) Glover's friends say that he has a good reputation as a nice guy and good person (slight weight); (18) Glover is very dependable and trustworthy (slight weight); (19) Glover's friends will continue to foster a relationship and visit him while he is incarcerated (slight weight); (20) Glover is a good boyfriend and companion (slight weight); (21) Glover has psychiatric, mental, and emotional disabilities (some weight); (22) Glover suffers from the effects of long-term alcohol and drug abuse (some weight); (23) Glover dropped out of high school in the tenth grade after his mother's death (slight weight); (24) Glover received a GED while he was incarcerated (minimal weight); (25) Glover believes in God (slight weight); and (26) Glover can contribute positively to open population (slight weight).

8. Because we are remanding for a new penalty phase, we do not address the remaining issues that Glover raises on appeal alleging errors in the penalty phase and challenging the proportionality of his sentence. Cf. Wood v. State, 209 So. 3d 1217, 1233 (Fla. 2017).

## 1. Sufficiency

Glover first argues that the evidence is insufficient to support his first-degree murder conviction, both as to his identity as the perpetrator and as to premeditation.[9]

"To prove first-degree premeditated murder, the State was required to establish that: (1) the victim, [Allen], is dead; (2) [Allen's] death was premeditated; and (3) [Allen's] death resulted from the criminal act of the defendant, [Glover]." Hodgkins v. State, 175 So. 3d 741, 747 (Fla. 2015). In a typical case, "[t]here is sufficient evidence to sustain a conviction 'if, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt.' " Id. at 746 (quoting Johnston v. State, 863 So. 2d 271, 283 (Fla. 2003)).

However, where, as in Glover's case, the conviction is based wholly upon circumstantial evidence, the following "special standard of review" applies:

> Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. McArthur v. State, 351 So. 2d 972 (Fla. 1977); Mayo v. State, 71 So. 2d 899 (Fla. 1954). The question of whether the evidence fails to exclude all reasonable hypotheses of

---

9. In capital cases, this Court also has an independent obligation to ensure that the evidence is sufficient to support the conviction. Dausch v. State, 141 So. 3d 513, 517 (Fla. 2014).

- 14 -

innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse.

Id. (emphasis added) (some citations omitted).

Further, to meet its burden in a purely circumstantial case,

the State is not required to rebut conclusively, every possible variation of events which could be inferred from the evidence, but must introduce competent evidence which is inconsistent with the defendant's theory of events. Once the State meets this threshold burden, it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt.

Id. (quotation and citations omitted).

In this case, Glover stipulated to the fact of Allen's death, and as explained below, the State carried its burden with respect to the two remaining elements, namely, Glover's identity as the killer and premeditation.

### a. Identity

As previously mentioned, in his opening statement to the jury, defense counsel argued that the evidence would establish that Glover and Allen were involved in a sexual relationship, including sexual contact on the morning of her murder. However, the evidence presented was not as foreshadowed; no evidence was introduced evincing a sexual relationship between Glover and Allen. To the contrary, Allen's daughter (who lived with Allen but was not at home when the murder occurred) testified that Allen did not "have any kind of relationship with [Glover]" and that, to her knowledge, Glover had never been inside their home.

- 15 -

With no evidence of a relationship between Glover and the victim and thus no innocent explanation for how Glover's DNA got on the victim's body, defense counsel emphasized the importance of Mary Alvin's testimony that there were always cars going back and forth from the victim's home, although Ms. Alvin testified that she did not see any vehicles or anyone other than Glover on their street the morning the victim's body was found. Defense counsel further faulted law enforcement's investigation, particularly for failing to collect Glover's shoes until the day after the victim's body was found and for failing to find the actual killer because law enforcement did not test all six hairs recovered from the victim's body (the one they did test matched the victim) or other evidence recovered from the scene (such as a glove, tools, cigarette butts, and soda cans).

Considering these arguments and the record as a whole, we find that the State met its burden to introduce competent evidence inconsistent with Glover's theory that he was not the killer. See Hodgkins, 175 So. 3d at 746. Specifically, through Alvin, the State placed Glover walking toward the victim's trailer three times in the hours before Glover allegedly discovered the victim's body. In addition, LaCounte testified to seeing someone matching Glover's general description go into the victim's trailer. Glover's touch DNA was recovered from the victim's left hand, head, and neck (where the majority of the victim's injuries were located), and the State's DNA expert testified that this DNA was not likely

left by casual contact.  Finally, the victim's blood spatter was found on the top of Glover's shoes.  Even Glover's own blood spatter expert acknowledged that one explanation for the victim's blood on Glover's shoes was that Glover was the killer.  Indeed, this is by far the most reasonable explanation.  Additionally, the State's evidence that there were no bloody footprints observed, even using an alternate light source, along with the other evidence already discussed, demonstrate the unreasonableness of Glover's alternative explanation.

Because the State met its burden to rebut Glover's hypothesis that someone else murdered the victim, Glover's identity as the perpetrator was a proper jury question.[10]  See Hodgkins, 175 So. 3d at 747.

### b.  Premeditation

Although Glover did not present evidence in support of a non-premeditation theory below, this Court nevertheless has the independent obligation to determine whether the evidence is sufficient.  As this Court has explained,

> Premeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to kill.  Premeditation may be formed in a moment and need only exist for such a time as will allow the accused to be conscious of the nature of the act he is about to commit and the

---

10.  Because the evidence on the identity element is sufficient under the reasonable-hypothesis-of-innocence special standard of review, it is necessarily sufficient under the standard of review that applies to cases in which the evidence of guilt is not wholly circumstantial.  See Pagan v. State, 830 So. 2d 792, 803 (Fla. 2002) ("If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction.").

probable result of that act. Premeditation can be shown by circumstantial evidence.

Morrison v. State, 818 So. 2d 432, 452 (Fla. 2002) (quotations and citations omitted). Further, "[e]vidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted." Sochor v. State, 619 So. 2d 285, 288 (Fla. 1993) (quotation omitted).

In Glover's case, the State presented evidence from which the jury could find that Allen's murder was premeditated. Chiefly, Allen was stabbed twelve times, with four fatal wounds severing her jugular vein and cutting her carotid and vertebral arteries. She was also manually strangled with enough force to break her hyoid bone and voice box. During the large number of seconds to small number of minutes it took for her to die, Allen also sustained blunt force wounds, scrapes, and abrasions. Blood flowed while Allen was in different positions, and at least some of her wounds were sustained in a position somewhere between standing and lying down. Her shirt was moved during the attack, and her shorts and underwear were removed and left hanging around her ankle, evincing at the very least a sustained attack giving rise to the reasonable inference of a sexual motive. We have found sufficient evidence of premeditation in analogous cases. See, e.g., Perry v. State, 801 So. 2d 78, 85-86 (Fla. 2001) (explaining that, "[a]lthough multiple stab

- 18 -

wounds alone do not prove premeditation," "the deliberate use of a knife to stab a victim multiple times in vital organs is evidence that can support a finding of premeditation" and, therefore, holding that seven wounds (four of which were fatal) to the victim's chest and neck, "both areas where an attack would produce grievous wounds," supported premeditation finding); Morrison, 818 So. 2d at 452 (finding, in a case involving two major knife wounds to the victim's neck, that the jury was "amply justified" in finding premeditation).

Furthermore, although Glover argues on appeal that his low IQ and drug use (as well as the victim's drug use) negated premeditation, no evidence supporting those arguments—and no evidence of any prior quarrel between Glover and the victim—was presented during the guilt phase. Rather, the evidence presented at trial left the jury with only two options: Glover was either not present at the time of the crime, or he committed premeditated murder.

On the record as a whole, the evidence was clearly sufficient to support the jury's finding of premeditation.

## 2. Victim's Drug Use

Glover next argues that the trial court abused its discretion by excluding evidence of the victim's drug use. We review the trial court's ruling for abuse of discretion, see Frances v. State, 970 So. 2d 806, 813 (Fla. 2007), and find none.[11]

The medical examiner's report revealed that the victim had cocaine and methadone in her system at the time of her death. The trial court granted the State's motion in limine to exclude the medical examiner's findings and any evidence of the victim's use, purchase, or possession of illegal drugs, over Glover's argument that the findings showed the victim bought drugs from a dealer and, in light of unidentified touch DNA on the victim's right hand, supported the inference that a drug dealer in the victim's home was the actual killer. However, the trial court qualified its ruling with the "proviso" that it might be necessary to "reexamine the ruling" if the State opened the door to drug use or Glover relied on drug use as a defense theory developed through his own witnesses. Neither occurred.

Given the speculative nature of Glover's argument, the trial court did not abuse its discretion in excluding the evidence at issue. Cf. Pierre v. State, 990 So. 2d 565, 569 (Fla. 3d DCA 2008) (holding trial court did not err in limiting cross-

---

11. Of course, in the context of evidentiary rulings, the trial court's discretion is also constrained by the rules of evidence.

examination of living victim's "history as a drug dealer" despite defendant's argument that the limitation left him "unable to develop a key defense—that a third party committed the crimes" because the defendant's theory "was entirely speculative and was not supported by any record evidence"); see also Persaud v. State, 755 So. 2d 150, 154 (Fla. 4th DCA 2000) ("Trials are fluid proceedings where evidentiary rulings are subject to change depending upon the state of the evidence presented at the time the court is asked to rule.").

### 3. **Nelson**

Glover next argues that his pretrial complaints regarding his failure to timely receive certain discovery and communication difficulties with his defense counsel should have triggered an inquiry to assess his defense counsel's effectiveness pursuant to Nelson v. State, 274 So. 2d 256 (Fla. 4th DCA 1973). We disagree.

A trial court's decision regarding whether to conduct a Nelson inquiry is subject to review for abuse of discretion. See Guardado v. State, 965 So. 2d 108, 113 (Fla. 2007). We have explained the purpose of and requirements for triggering a Nelson hearing as follows:

> The Sixth Amendment of the United States Constitution guarantees the right to effective assistance of counsel at all critical stages of a criminal prosecution. . . .
> The right of a criminal defendant to effective assistance of counsel includes the right to competent counsel. Mere unhappiness or anger with the representation of counsel, or disagreement with regard to counsel's strategic decisions, does not render counsel ineffective. If court-appointed counsel is alleged to be incompetent during the trial

level proceedings, a trial court must conduct a <u>Nelson</u> hearing to inquire into the effectiveness of counsel.  See <u>Hardwick v. State</u>, 521 So. 2d 1071, 1074-75 (Fla. 1988) (approving the procedure provided in <u>Nelson v. State</u>, 274 So. 2d 256, 258-59 (Fla. 4th DCA 1973), for an inquiry with regard to a claim of alleged ineffective assistance of counsel).  However, a <u>Nelson</u> hearing is only required when the defendant provides a specific complaint to the trial court with regard to the ineffectiveness of counsel.  See <u>Guardado v. State</u>, 965 So. 2d 108, 113 (Fla. 2007).  A generalized complaint about counsel does not trigger a required <u>Nelson</u> hearing.  See <u>id.</u> ("However, any [<u>Nelson</u>] inquiry by the trial court can only be as specific as the complaints made by the defendant.  When the defendant makes generalized complaints about counsel, the trial court need not make a <u>Nelson</u> inquiry.").

<u>Taylor v. State</u>, 87 So. 3d 749, 758 (Fla. 2012) (citations omitted); <u>see</u> <u>Davis v. State</u>, 136 So. 3d 1169, 1209 (Fla. 2014) ("[E]xpressions of disagreement with trial counsel's strategy or complaints about lack of communication . . . do not give cause for a <u>Nelson</u> hearing.").

In this case, Glover did not allege that his counsel was ineffective.  Rather, Glover's letters to the trial court and his statements in response to the trial court's inquiries show that Glover attempted to ensure that defense counsel communicated with him about the status of his case, including discovery received, and complained that it took counsel longer to do those things than Glover believed it should have.  On these facts, a <u>Nelson</u> hearing was not required, and, therefore, the trial court did not abuse its discretion by not conducting one.  See <u>Taylor v. State</u>, 87 So. 3d at 758; <u>Davis</u>, 136 So. 3d at 1209.

## 4. Ineffective Assistance of Counsel

As his final guilt phase claim, Glover argues that his defense counsel was ineffective. We have repeatedly held that this claim is not cognizable on direct appeal unless defense counsel's ineffectiveness is apparent on the face of the record. See Gore v. State, 784 So. 2d 418, 437-38 (Fla. 2001). Here, it is not. Therefore, defense counsel's alleged failings in handling Glover's intellectual disability claim and in not following through on his promise during opening statements at Glover's trial to establish a sexual relationship between Glover and the victim are properly explored on postconviction.[12] See Smith v. State, 998 So. 2d 516, 522-23 (Fla. 2008) (explaining that, only "in the rare case, where both prongs of Strickland [v. Washington, 446 U.S. 668 (1984)]—the error and the prejudice—are manifest in the record, an appellate court may address an ineffective assistance claim" on direct appeal).

## 5. Intellectual Disability

Glover next argues that the trial court erred by rejecting his intellectual disability claim. However, because the trial court analyzed Glover's intellectual disability claim as required by Hall v. Florida, 134 S. Ct. 1986 (2014), and

---

12. Glover also argues that his defense counsel was ineffective for failing to preserve certain objections, but he only gives the example of a penalty phase issue regarding victim impact testimony that we do not reach in light of our decision to remand for a new penalty phase.

competent, substantial evidence supports the trial court's finding that Glover is not intellectually disabled, we affirm the trial court's finding.

The United States Supreme Court's decision in Atkins v. Virginia, 536 U.S. 304 (2002), categorically bars executing the intellectually disabled. Under Florida's three-prong test for intellectual disability, a defendant must demonstrate "(1) significantly subaverage general intellectual functioning; (2) concurrent deficits in adaptive behavior; and (3) manifestation of the condition before age eighteen." Salazar v. State, 188 So. 3d 799, 811 (Fla. 2016); see also Fla. R. Crim. P. 3.203; § 921.137(1), Fla. Stat. (2013). At the time of Glover's penalty phase presentation to his jury, Florida law precluded an individual with an IQ score above 70 from establishing the first prong, thereby barring an intellectual disability claim premised upon Glover's full-scale IQ score of 72. See Cherry v. State, 959 So. 2d 702, 712-14 (Fla. 2007).

However, after Glover's Spencer hearing—but before he was sentenced— the United States Supreme Court held that Florida's "strict IQ test score cutoff of 70" violates the Eighth Amendment prohibition against cruel and unusual punishment. Hall, 134 S. Ct. at 1994. Recognizing that "intellectual disability is a condition, not a number," id. at 2001, the Supreme Court in Hall concluded that Florida's practice of barring a defendant with an IQ above 70 from establishing intellectual disability improperly "fail[s] to take into account the SEM"—i.e., the

standard error of measurement, which is generally five points on either side of the recorded score, id. at 2000. Accordingly, the Supreme Court held that, "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." Id. at 2001. In so holding, the Supreme Court emphasized that the requisite test for establishing intellectual disability is a "conjunctive and interrelated assessment" under which "[i]t is not sound to view a single factor as dispositive." Id. (quoting the fifth (and most recent) edition of the Diagnostic and Statistical Manual of Mental Disorders for the proposition that "a person with an IQ score above 70 may have such severe adaptive behavior problems . . . that the person's actual functioning is comparable to that of individuals with a lower IQ score").

Although Hall authorizes defendants who, like Glover, have IQ scores within the SEM to raise an intellectual disability claim, Hall does not alter the standard for reviewing the trial court's determination as to whether the defendant is intellectually disabled:

> In reviewing the circuit court's determination that [the defendant] is not intellectually disabled, "this Court examines the record for whether competent, substantial evidence supports the determination of the trial court." State v. Herring, 76 So. 3d 891, 895 (Fla. 2011). [This Court] "[does] not reweigh the evidence or second-guess the circuit court's findings as to the credibility of witnesses." Brown v. State, 959 So. 2d 146, 149 (Fla. 2007). However, [this Court]

> appl[ies] a de novo standard of review to any questions of law. <u>Herring</u>, 76 So. 3d at 895.

<u>Oats v. State</u>, 181 So. 3d 457, 459 (Fla. 2015).

In Glover's case, in response to <u>Hall</u>, the trial court properly granted Glover's request to reopen the <u>Spencer</u> hearing to determine whether he is intellectually disabled. By that time, however, Glover's relationship with his appointed counsel had deteriorated to the point that Glover refused to meet with defense counsel or submit to evaluations, despite the trial court's urging him to do so. Although Glover never submitted to further evaluation, the trial court held three additional proceedings as part of the reopened <u>Spencer</u> hearing, at which Glover's brother, Anthony, and two mental health experts testified. Glover's expert, Dr. Neidigh, testified that he could not definitively say that Glover is intellectually disabled. In contrast, the State's expert, Dr. Prichard, testified that Glover is not intellectually disabled, citing a full-scale IQ score of 80 that Glover achieved at age sixteen and school records demonstrating that Glover was placed in specific learning disabled classes because he was underperforming academically rather than intellectually disabled, and attributing any deficits in adaptive functioning to Glover's behavioral problems, drug use, and mental health issues. Thereafter, the trial court entered a detailed order that, as required by <u>Hall</u>, includes an interrelated assessment of all three statutory factors for establishing

intellectual disability and finding, based on the greater weight of the evidence, that Glover is not intellectually disabled.

On appeal, Glover argues that the trial court improperly considered dispositive the full-scale IQ score of 80 that he achieved at age sixteen and that the trial court's finding is otherwise not supported by competent, substantial evidence. We disagree.

The record belies Glover's argument that the trial court used his 80 IQ score to end the intellectual disability inquiry. In addition to his IQ score of 80 (that does not fall within the SEM), Glover presented evidence of an adult-achieved full-scale IQ score of 72 (that does fall within the SEM), as well as two scores that, while not as reliable as the other scores according to the experts, actually fall within the range of intellectual disability—i.e., a childhood score of 69 from an achievement test used to estimate IQ and an adult-achieved score of 67 on the Wechsler Abbreviated Scale of Intelligence. In light of these scores, Glover was permitted to present—and the trial court actually considered—evidence regarding deficits in his adaptive functioning in support of his argument that his alleged intellectual disability manifested before the age of eighteen. Cf. Oats, 181 So. 3d at 467-68 ("[T]he Supreme Court has now stated [in Hall] that courts must consider all three prongs in determining an intellectual disability, as opposed to relying on just one factor as dispositive. . . . [B]ecause these factors are

- 27 -

interdependent, if one of the prongs is relatively less strong, a finding of intellectual disability may still be warranted based on the strength of other prongs.").

That the trial court ultimately rejected testimony from Glover's expert that the full-scale 80 IQ score is an outlier and accepted testimony from the State's expert that this score is the most reliable evidence as to whether Glover demonstrated significantly subaverage general intellectual functioning prior to the age of eighteen—especially in light of school records documenting that Glover was underperforming academically rather than intellectually disabled—does not violate Hall. See Rodriguez v. State, 219 So. 3d 751, 756 (Fla. 2017) ("[T]his Court does not reweigh evidence or second guess a circuit court's credibility determinations."); see also Hampton v. State, 219 So. 3d 760, 777 n.7 (Fla. 2017) (rejecting "unapproved" tests for purposes of determining intellectual disability).

Additionally, the trial court's determination that Glover's troublemaking and criminal activity prior to age eighteen indicate that Glover's adaptive deficits were the result of behavioral or psychological issues (rather than intellectual disability) is supported by competent, substantial evidence and does not run afoul of Hall. As the trial court further found, "[t]estimony and records provide substantial and competent evidence [Glover] was able to communicate, care for himself, and live normally in his home with others," and "his performance at school belies any

contention of intellectual disability." Cf. Hampton, 219 So. 3d 779 (explaining that, under the DSM-5, which the experts in Glover's case testified that they relied upon, "[t]he [adaptive functioning] deficits 'must be directly related to the intellectual impairments' associated with the first prong; namely, 'reasoning, problem solving, planning, abstract thinking, judgment, learning from instruction and experience, and practical understanding.' ") (quoting American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders, 37-38 (5th ed. 2013)).

Moreover, although Glover thwarted attempts to evaluate his adaptive functioning through formal testing, abundant evidence regarding Glover's functioning, both prior to age eighteen and as an adult, supports the trial court's finding that the requisite connection between Glover's alleged adaptive functioning deficits and intellectual disability is lacking. For example, Glover excelled as a wrestler in school, and his school records include comments such as Glover "has good potential," "is a very good math student," and "has shown a great deal of improvement in all areas." While these records also recommend that Glover "be placed in the 10th grade and given remedial work," they encourage his pursuit of "a vocational program in which he can take a trade of his interest." Similarly, evidence regarding Glover's adaptive functioning after the age of eighteen shows that Glover successfully obtained his GED, performed various types of work (including restoring buildings, landscaping, and plumbing and electrical work),

took care of his daily needs, made meals, helped his sister take care of herself and her home following her husband's death, and gave good life advice to his daughter.

As required by Hall, Glover "was permitted to present evidence of all three prongs of the test for an intellectual disability.  The trial court considered each prong in tandem in determining that [Glover] was not intellectually disabled; no single factor was considered dispositive."  Snelgrove v. State, 217 So. 3d 992, 1004 (Fla. 2017).  Even Glover's own mental health expert testified that, while "there's information that [Glover] is [intellectually disabled]," there is also "a case that could be made that he isn't," leaving the ultimate "judgment call" for the trial court.  (R12: 2095-96).[13]  Because, in Glover's case, the trial court made a call supported by competent, substantial evidence, we affirm its determination that Glover is not intellectually disabled.[14]  See Oats, 181 So. 3d at 465-66.

---

13. The determination that Glover is not intellectually disabled was made under "the generally accepted, uncontroversial intellectual-disability diagnostic definition," which is the same three-part standard that this Court follows.  See Rodriguez, 219 So. 3d 751, 756 n.6 (Fla. 2017) (quoting Moore v. Texas, 137 S. Ct. 1039, 1045 (2017)).  This distinguishes the trial court's determination in Glover's case from a Texas court's determination in a recent case, which the Supreme Court invalidated, in part, because the Texas court relied upon superseded medical standards to conclude that the defendant was not intellectually disabled.  See generally Moore, 137 S. Ct. 1039.

14. We further decline Glover's invitation to consider arguments not raised below, such as how adjusting for the Flynn Effect might impact Glover's test scores and that the 1980 full-scale IQ test was inappropriate for Glover's age.  Neither mental health expert mentioned the Flynn Effect during their testimony, let alone expressed concerns that the Flynn Effect, which "refers to a theory in which

- 30 -

## 6. **Hurst**

Finally, Glover argues that Hurst error that is not harmless requires this Court to reverse his death sentence. We agree, vacate Glover's death sentence, and remand for a new penalty phase.

In Hurst v. Florida, 136 S. Ct. 616, 619 (2016), the Supreme Court held that "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death. A jury's mere recommendation is not enough." On remand from the Supreme Court, in Hurst v. State, 202 So. 3d at 54, we held that, "in addition to unanimously finding the existence of any aggravating factor, the jury must also unanimously find that the aggravating factors are sufficient for the imposition of death and unanimously find that the aggravating factors outweigh the mitigation before a sentence of death may be considered by the judge." We further held that a unanimous jury recommendation is required before a trial court may impose a sentence of death. Id. Finally, we determined that Hurst error is capable of harmless error review. Id. at 67.

---

the intelligence of a population increases over time," Wright v. State, 213 So. 3d 881, 897 n.4 (Fla. 2017), rendered Glover's 80 IQ score unreliable. Further, neither expert testified that the test by which Glover achieved this score was unreliable, outdated, or age inappropriate. To the contrary, the State's expert testified that it was both appropriate for Glover at age sixteen and that although revised, it remains "the gold standard" today.

"New rules of law announced by this Court or the United States Supreme Court will apply to all cases that are pending on direct review or are otherwise not finalized." Calloway v. State, 210 So. 3d 1160, 1200 (Fla. 2017). Accordingly, Glover's direct appeal is subject to Hurst v. Florida and Hurst v. State. See id. In light of the ten-to-two jury recommendation for death, Hurst error occurred in Glover's case. See Kopsho v. State, 209 So. 3d 568, 570 (Fla. 2017) ("Because Kopsho was condemned by a vote of ten to two, we find that Kopsho's sentence is the result of Hurst v. Florida error.").

We must next consider whether the error is harmless beyond a reasonable doubt:

> "The harmless error test, as set forth in Chapman [v. California, 386 U.S. 18 (1967),] and progeny, places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." Where the error concerns sentencing, the error is harmless only if there is no reasonable possibility that the error contributed to the sentence. See, e.g., Zack v. State, 753 So. 2d 9, 20 (Fla. 2000).

Hurst v. State, 202 So. 3d at 68 (quoting State v. DiGuilio, 491 So. 2d 1129, 1138 (Fla. 1986)).

Applying the required harmless error analysis, we have consistently held that Hurst error is not harmless in cases where the jury makes a non-unanimous recommendation of death. See, e.g., Kopsho, 209 So. 3d at 570. The ten-to-two

jury recommendation in Glover's case compels the same conclusion because "we cannot determine that the jury unanimously found that the aggravators outweighed the mitigation." Id. "We can only determine that the jury did not unanimously recommend a sentence of death." Id. Therefore, because we cannot say that there is no reasonable possibility the Hurst error contributed to the sentence, the error in Glover's sentencing is not harmless beyond a reasonable doubt.

Accordingly, we vacate Glover's death sentence and remand for a new penalty phase pursuant to Hurst v. State.

## CONCLUSION

For the foregoing reasons, we affirm Glover's conviction for first-degree murder but remand for a new penalty phase pursuant to Hurst v. State.

It is so ordered.

LABARGA, C.J., and PARIENTE, QUINCE, and LAWSON, JJ., concur.
LEWIS, J., concurs in result.
CANADY and POLSTON, JJ., concur as to the conviction and dissent as to the sentence.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Duval County,
 Mallory Durden Cooper, Judge - Case No. 162012CF006463AXXXMA

Brian W. Stull, Senior Staff Attorney, and Anna Arceneaux, Staff Attorney, American Civil Liberties Union, Capital Punishment Project, Durham, North Carolina; Nancy G. Abudu of American Civil Liberties Union Foundation of Florida, Inc., Miami, Florida; and N. Adam Tebrugge, Bradenton, Florida,

for Appellant

Pamela Jo Bondi, Attorney General, and Berdene Beckles, Assistant Attorney General, Tallahassee, Florida; and Donna M. Perry, Assistant Attorney General, West Palm Beach, Florida,

for Appellee